## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD.<br>& C&U AMERICAS, LLC, | **PUBLIC VERSION**<br><br>Ct. No. 24-00025 |
| Plaintiffs, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the administrative record, the response thereto, the reply, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.


_____
                                        JUDGE

Dated:

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| _____ )  | **PUBLIC VERSION** |
| SHANGHAI TAINAI BEARING CO., LTD. ) | |
| & C&U AMERICAS, LLC, ) | Ct. No. 24-00025 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

---

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL
Jesus Saenz
Attorney
Office of Chief Counsel
For Trade Enforcement & Compliance
Department of Commerce

TATE NATHAN WALKER
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 307-0163
Fax: (202) 305-7643

November 14, 2024                _Attorneys for Defendant_

## **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.     Administrative Determination Under Review ..........................................2

    II.    Issues Presented For Review .....................................................................2

STATEMENT OF FACTS .........................................................................................2

    I.     Commerce's Administrative Review ..........................................................2

        A.  Commerce's Preliminary Results........................................................3

        B.  Commerce's Final Results ...................................................................6

SUMMARY OF THE ARGUMENT ..........................................................................8

ARGUMENT ............................................................................................................9

    I.     Standard Of Review....................................................................................9

        A.  Substantial Evidence............................................................................9

        B.  *Loper Bright* Framework ...................................................................11

    II.    Commerce's Decision To Use Cohen's *d* As Part Of Its Differential Pricing Analysis Is Supported By Substantial Evidence And Otherwise In Accordance With Law...............................................................................13

        A.  Relevant Statuary Framework Of Differential Pricing Analysis Methodologies.....................................................................................13

        B.  Commerce's Use Of Differential Pricing Analysis ...........................15

        C.  Commerce Lawfully Applied Its Differential Pricing Analysis In Evaluating Tainai's United States Sale Prices.....................................18

            1.   Commerce Conducted The Cohen'*s d* Test Using Comparable Merchandise ................................................................................19

            2.   Tainai's Own Analysis Of Its Sales Simply Masks Dumping....................23

    III.   Commerce's Application Of The Differential Pricing Analysis Has Not Been Disturbed By The Supreme Court's Decision In *Loper Bright*..............................26

A. *Loper Bright* Did Not Disturb Existing Precedent..............................................27

B. *Loper Bright* Has Not Disturbed The Discretion Granted To Commerce By Statute ..................................................................................................................29

CONCLUSION.................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Apex Frozen Foods Priv. Ltd. v. United States,*
   862 F.3d 1337 (Fed. Cir. 2017)........................................................................*passim*

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,*
   102 F.4th 1252 (Fed. Cir. 2024)...................................................................... 29

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984)......................................................................... 9

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,*
   5 F.4th 1367 (Fed. Cir. 2021).......................................................................... 32

*Bureau of Alcohol, Tobacco and Firearms v. FLRA,*
   464 U.S. 89 (1983)........................................................................................... 12

*CBOCS West, Inc. v. Humphries,*
   553 U.S. 442 (2008)......................................................................................... 12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984)...................................................................................*passim*

*Cleo Inc. v. United States,*
   501 F.3d 1291 (Fed. Cir. 2007)....................................................................... 10

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States,*
   66 F.4th 968 (Fed. Cir. 2023).......................................................................... 33

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938)........................................................................................... 9

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966)........................................................................................... 9

*Dickerson v. United States,*
   530 U.S. 428 (2000)......................................................................................... 12

*Dillinger France S.A. v. United States,*
   981 F.3d 1318 (Fed. Cir. 2020)................................................................. 21, 26

*Dongkuk S&C Co. v. United States,*
   600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022)................................................ 6, 7

*Fujitsu Gen. Ltd. v. United States,*
  88 F.3d 1034, 1039 (Fed. Cir. 1996) ............................................................ 10, 26, 32

*Goldlink Indus. Co. v. United States,*
  431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................ 10

*Halliburton Co. v. Erica P. John Fund, Inc.,*
  573 U.S. 258 (2014) ................................................................................................ 12

*INS v. Elias-Zacarias,*
  502 U.S. 478 (1992) ................................................................................................ 10

*JBF RAK LLC v. United States,*
  790 F.3d 1358 (Fed. Cir. 2015) ......................................................................... *passim*

*JBF RAK LLC v. United States,*
  991 F. Supp. 2d 1343 (Ct. Int' Trade 2014) ........................................................ 28

*Loper Bright Enterprises v. Raimondo,*
  144 S. Ct. 2244 (2024), overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense
  Council, Inc.,* 467 U.S. 837 (1984) ................................................................ *passim*

*Melamine Chemicals, Inc. v. United States,*
  732 F.2d 924 (Fed. Cir. 1984) ............................................................................... 33

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ............................................................................... 9

*PSC VSMPO-Avisma Corp. v. United States,*
  688 F.3d 751 (Fed. Cir. 2012) ............................................................................... 10

*SeAH Steel Corp. v. United States,*
  619 F. Supp. 3d 1309 (Ct. Int'l Trade 2023) ........................................................ 18

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
  203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ........................................................ 10

*Skidmore v. Swift & Co,*
  323 U.S. 134 (1944) ........................................................................................... 11, 12

*Smith-Corona Group v. United States,*
  713 F.2d 1568 (Fed. Cir. 1983) ......................................................................... 32, 33

*Stanley Works Fastening Sys. Co., Ltd. v. United States,*
  279 F. Supp. 3d 1172 (Ct. Intl. Trade 2017) ..................................................... 10, 32

*Stupp Corp. v. United States*,
  5 F.4th 1341 (Fed. Cir. 2021)..................................................................*passim*

*Stupp Corp. v. United States*,
  619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023)..........................................*passim*

*Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013)........................................................... 13

*United States Steel Group v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996)........................................................ 30, 31

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ........................................................................... 9

## Statutes

5 U.S.C. § 706.................................................................................... 11, 13

19 U.S.C. § 1516a(b) ............................................................................ 9, 13

19 U.S.C. § 1673 ..................................................................................... 13

19 U.S.C. § 1675 ..................................................................................... 28

19 U.S.C. § 1675(c) ................................................................................. 32

19 U.S.C. § 1677(7)(C)(iii) (1988) ............................................................ 30

19 U.S.C. § 1677a(a) ............................................................................... 13

19 U.S.C. § 1677a(b) ............................................................................... 13

19 U.S.C. § 1677b(a) ............................................................................... 13

19 U.S.C. § 1677f-1(d) ......................................................................*passim*

19 U.S.C. § 3512(d) ........................................................................... 32, 33

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Doc. No. 103-316, vol. 1 (SAA) at 842...................................*passim*

**Rules**

Ct. Int'l Trade R. 56.2 ................................................................................ 1

**Regulations**

19 C.F.R. § 351.414(b) ............................................................................ 14

19 C.F.R. § 351.414(c) ........................................................................ 14, 28

19 C.F.R. § 414(c)(1) ................................................................................ 4

**Administratve Determinations**

*Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China,*
   52 Fed. Reg. 22,667 (Dep't of Commerce June 15, 1987) ........................ 2

*Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011,*
   77 Fed Reg. 73415 (Dep't of Commerce Dec. 10, 2012) ......................... 4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
   87 Fed. Reg. 48,459 (Dep't of Commerce Aug. 9, 2022) .......................... 3

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results and Review; 2021-2022,*
   89 Fed. Reg. 1,548 (Dep't of Commerce Jan. 10, 2024) ......................... 2

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2021-2022,*
   88 Fed. Reg. 43,290 (Dep't of Commerce July 7, 2023) .......................... 3

*Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand,*
   55 Fed. Reg. 6,669 (Dep't of Commerce Feb. 26, 1990) .......................... 3

*Xanthan Gum from the People's Republic of China,*
   78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013) ................... 15, 16

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| _____ ) | **PUBLIC VERSION** |
| SHANGHAI TAINAI BEARING CO., LTD.          ) | |
| & C&U AMERICAS, LLC,                        ) | Ct. No. 24-00025 |
| ) | |
| ) | |
| Plaintiffs,          ) | |
| ) | |
| v.                          ) | |
| ) | |
| UNITED STATES,                             ) | |
| ) | |
| Defendant.          ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT
ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the United States Court of International Trade's rules,

defendant, the United States, respectfully submits this response to the motion for judgment on

the administrative record filed by plaintiffs Shanghai Tainai Bearing Co., LTD and C&U

Americas, LLC (collectively, Tainai).  Plaintiffs contest two aspects of the United States

Department of Commerce's (Commerce) final results of the thirty-fifth (2021-2022)

administrative review of its antidumping duty order covering tapered roller bearings and parts

thereof, finished and unfinished (TRBs), from the People's Republic of China (China).  Because

Commerce's determination is supported by substantial evidence and is in accordance with law,

we respectfully request that the Court deny plaintiffs' motion and enter judgment for the United

States.

## STATEMENT PURSANT TO RULE 56.2

### I.    Administrative Determination Under Review

Plaintiffs challenge the final results of the thirty-fifth (2021-2022) administrative review of the antidumping duty order covering TRBs from China.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished*, *from the People's Republic of China; Final Results and Review*; 2021-2022, 89 Fed. Reg. 1,548 (Dep't of Commerce Jan. 10, 2024) (final results) (Appx003144-003146), and accompanying Issues and Decision Memorandum (IDM). (Appx003116-0031134).  The period of review is July 1, 2021 through May 31, 2022. (Appx003117).

### II.    Issues Presented For Review

1.    Whether Commerce's finding that Tainai's pattern of prices differed significantly among purchasers, regions, or time periods is supported by substantial evidence and in accordance with law.

2.    Whether Commerce's application of its differential pricing analysis is undermined by the Supreme Court's decision in *Loper Bright* overturning *Chevron*, given that the Supreme Court made clear that earlier cases relying on *Chevron* remain good law and given that the Court of Appeals for the Federal Circuit previously sustained Commerce's use of differential pricing in reviews.

## STATEMENT OF FACTS

### I.    Commerce's Administrative Review

In 1987, Commerce published the first antidumping order on TRBs from China. *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22,667 (Dep't of Commerce June 15, 1987),

as amended, *Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6,669 (Dep't of Commerce Feb. 26, 1990).  On August 9, 2022, Commerce published the initiation notice for the thirty-fifth (2021-2022) administrative review of the antidumping duty order covering tapered roller bearings from China.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. No. 48,459 (Dep't of Commerce Aug. 9, 2022) (Appx001068).

Commerce selected Tainai as a mandatory respondent after it timely filed a separate rate certification and since it was the only company with suspended entries of subject merchandise during the period of review.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Respondent Selection* (Dep't of Commerce October 7, 2022) (Appx001282); *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43,290 (Dep't of Commerce July 7, 2023) (preliminary results) (Appx003008-003009), and accompanying Preliminary Decision Memorandum (PDM) (Appx002986-003007).

### A.    Commerce's Preliminary Results

On July 7, 2023, Commerce published its preliminary results wherein it identified several deficiencies in Tainai's factors of production data.  Appx00298-002999.  Commerce reiterated that Tainai had not secured cooperation from its unaffiliated suppliers and that those suppliers were material to its statutory duty.  *Id.*  Commerce concluded that this was not a situation which it could excuse the lack of factors of production data because these suppliers provided a large percentage of Tainai's merchandise.  Appx002999.  Thus, Commerce applied partial adverse

facts available as to the turned cups and cones supplied by the uncooperative producers.
Appx003000.

Commerce calculated Tainai's preliminary weighted-dumping average of 27.02 percent
for Tainai. Appx003009. Commerce applied its differential pricing analysis to determine
whether there was a pattern of prices for comparable merchandise that differed significantly
among purchasers, regions, or time periods, consistent with 19 U.S.C. § 1677f-1(d)(1)(B)(i).
Appx003002-0030003. Commerce applied differential pricing analysis because, while
Commerce normally would "calculate{}a weighted-average dumping margin by comparing
weighted-average NV's {normal values} to weighted-average EPs {export prices} or CEPs
{constructed export prices} (*i.e.,* the average-to-average method)," Commerce may determine an
alternative "method is appropriate in a particular situation." Appx003001. Commerce cited its
regulatory practice found in 19 C.F.R. § 414(c)(1) and its decisions in prior administrative
reviews for support. *Id.* (citing *Ball Bearings and Parts Thereof from France, Germany, and
Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 Fed Reg.
73,415 (Dep't of Commerce Dec. 10, 2012), and accompanying IDM at Comment 1; *JBF RAK
LLC v. United States*, 790 F.3d 1358, 1363-65 (Fed. Cir. 2015)).

Commerce employs a three-stage test as part of its differential pricing analysis.
Appx003002. At the first stage, Commerce uses the Cohen's *d* coefficient which is "a generally
recognized statistical measure of the extent of the difference between the mean (*i.e.,* the
weighted-average price) of a test group and the mean (*i.e.,* the weighted -average price) of a
comparison group." *Id.* Employing this method, Commerce will then "evaluate the extent to
which the prices to the particular purchaser, region, or time period differ significantly from the
prices of all other sales of comparable merchandise." *Id.* The calculated differences or results

are quantified using three fixed threshold ratios, per the Cohen's *d* test: "small, medium, or large (0.2, 0.5, and 0.8, respectively)." *Id.* "{T}he large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups." *Id.* The inverse is also true with the small coefficient showing a very weak indication of a difference between the groups. *Id.* "{T}he difference is considered significant and the sales in the test group are found to pass the Cohen's *d* test, if the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.,* 0.8) threshold." *Id.*

Commerce then explained that if a product passes the Cohen's *d* test, then a ratio test is used to "assess{} the extent of the significant price differences for all sales as measured by the Cohen's *d* test." *Id.* Commerce noted that "{i}f the value of sales to purchasers, regions, and time periods, that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales" instead of the average-to-average method. *Id.* If both the Cohen's *d* test and the ratio test show a pattern of prices that differ significantly, Commerce will then consider if the average-to-average method can account for the differences. Appx003002-003003. Commerce will then test the difference between using the average-to-average method and the average-to-transaction test. Appx003003. If the difference is meaningful—a 25 percent relative change or if the dumping margins difference move across the de minimis threshold— then Commerce will apply the average-to-transaction method. *Id.*

Here, Commerce found that 69 percent of the value of U.S. sales passed the Cohen's *d* test; thus, Commerce determined the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. *Id.* Pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(ii),

Commerce also determined that the average-to-average (A-to-A) method could not account for the existence of the price differences exhibited by Tainai's pricing behavior in the U.S. market because the weighted-average dumping margin was below de minimis when using the average-to-average method and above de minimis when applying the average-to-transaction method to all sales. *Id*. Accordingly, Commerce applied the average-to-transaction method to all of Tainai's U.S. sales to calculate the preliminary weighted-average dumping margin. Commerce invited comments from the parties about the application of its differential pricing analysis. *Id.*

### B.  **Commerce's Final Results**

After publication of the preliminary results, Tainai raised arguments pertaining to Commerce's application of the differential pricing analysis. Appx003075; Appx086123. Tainai did not argue that Commerce's use of Cohen's *d* was per se unlawful, stating that "is simply one tool for making this determination." *Id*. However, Tainai did argue that it was "misapplied in this matter." *Id*. Namely, Tainai argued that Commerce must conduct its differential pricing analysis on a CONNUM[1] specific basis because Tainai's bearings vary in price due to "size, design, and components" and these price variances cause the bearings to pass the Cohen's *d* test when any price variance "is clearly not based on the purchaser, region or time period." Appx003075-003076; Appx086123-086124. Tainai provided an exhibit which it opined supported its assertions that there was limited number of price increases and that its pattern of

---

[1] "A 'CONNUM' is a contraction of the term 'product control number,' and is Commerce's jargon for a unique product defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding. All products whose product hierarchy characteristics are deemed to be identical are part of the same CONNUM and are regarded as 'identical' merchandise" for the purposes of Commerce's margin calculations. *Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331, 1334 n.4 (Ct. Int'l Trade 2022). The physical characteristics defining a unique CONNUM vary from proceeding to proceeding depending on the scope of each proceeding as the definition of the subject merchandise changes. *Dongkuk*, 600 F. Supp 3d at 1334 n.4.

prices did not vary significantly among purchasers, regions, and time periods.  Appx0086124; Appx003076; *see* Exhibit CB-1 at Appx086129.  This exhibit, sorted by the CONNUM classifications for Tainai's products, provides the quantities of sales per CONNUM and the prices for each series of sales.  Appx086129.

In response, the domestic industry filed a rebuttal brief contending that Commerce should reject Tainai's arguments as to its application of differential pricing analysis.  Appx003092.  The domestic industry focused on the purpose of applying differential pricing methodologies— because the use of the average-to-average method masks dumping.  *Id.*  The domestic industry also argued that Tania's admonition that Commerce's application of differential pricing methodology is improper because any patterns of differences may be attributable to weight differences or normal market price adjustments over time is misguided.  *Id.*  The domestic industry contended that nothing in the statue requires a showing of intent to dump.  *Id*. (citing *JBF RAK*, 790 F.3d at 1368).  The domestic industry relied on the Federal Circuit's decision in *Stupp Corp. v. United States*, 5 F.4th 1341, 1354 (Fed. Cir. 2021) (*Stupp III*) to explain that Commerce's differential pricing analysis methodology, used to fill a statutory gap, has already been sustained.  *Id.*

On January 3, 2024, Commerce released its final results.  Appx003116.  In its final results, Commerce addressed the concerns Tainai's raised in its case brief after the preliminary results.  Relevant here*,* Commerce explained that the differential pricing analysis was performed on a CONNUM-specific basis; thus, Tainai's argument regarding the need to conduct the analysis on a CONNUM-specific basis was moot.  Appx003132-003133 (citing Preliminary Calculation Memo at Appx085759-085760; Attachment II at Appx086030-086044).  Specifically, Commerce also rejected Tainai's argument that it is required to determine why the

pattern of prices may differ significantly across purchasers, regions, or time periods.

Appx003132; (citing *JBF RAK*, 790 F.3d at 1368).   Second, Commerce explained that any price

differences identified by the Cohen's *d* test are significant and, consistent with the preliminary

results, continued to find that there was a pattern of prices for comparable merchandise that

differed significantly among purchasers, regions, or time periods.  Appx003133-003134.

Commerce explained that while Tainai identified generally small price variances,"{w}hen there

is little variation in prices within each of these groups . . . , then a small difference in mean prices

of the test and comparison group will be found to be significant."  Appx003132-003133.  Thus,

in the final results, Commerce continued to rely on its differential pricing analysis including the

use of Cohen's *d* for one part of that test and found that a pattern of prices existed that the

average-to-average method could not unmask.  Appx003133.  Consequently, Commerce

continued to use the average-to-transaction method to calculate Tainai's weighted-average

dumping margin in its final results.

## SUMMARY OF THE ARGUMENT

The Court should sustain the final results because plaintiffs have not demonstrated that

Commerce's findings are unsupported by substantial evidence or otherwise not in accordance

with law.  First, Commerce conducted its differential pricing analysis using comparable

merchandise, on a CONNUM-specific basis, consistent with its practice.  The seemingly small

differences in pricing that Tainai points to in its incomplete exhibit simply mask dumping and its

own analysis does not provide a sound way to fulfill Commerce's statutory duty of addressing

dumping.

Second, Commerce lawfully applied its differential pricing analysis, consistent with

Federal Circuit precedent.  Nothing about the Supreme Court's decision in *Loper Bright* disturbs

Commerce's delegated authority, sustained by the Federal Circuit, to employ its price differential analysis. Indeed, the Supreme Court made clear that prior cases applying *Chevron* are still binding precedent. Accordingly, Commerce's decision to rely on its differential pricing analysis and use the average-to-transaction method to calculate Tainai's weighted-average dumping margin is supported by substantial evidence and in accordance with law. This Court should sustain Commerce's final results.

## ARGUMENT

### I.      Standard Of Review

#### A.      Substantial Evidence

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Additionally, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (noting tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

Additionally, the Court affords Commerce "tremendous deference" when Commerce exercises its technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (citations omitted). This is true in the antidumping context as well since "{a}ntidumping . . . duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Stanley Works Fastening Sys. Co., Ltd. v. United States*, 279 F. Supp. 3d 1172, 1185 (Ct. Intl. Trade 2017) (quoting *PSC*, 688 F.3d at 764, *cited in Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1347 (Fed. Cir. 2017)).

B.    *Loper Bright* **Framework**

Construing the Administrative Procedure Act, 5 U.S.C. § 706, the Supreme Court in

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2254 (2024), overruled *Chevron, U.S.A., Inc.*

*v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, courts employed a two-

step framework for an agency's interpretation of statutes that Congress entrusted them to

administer. *Loper Bright*, 144 S. Ct. at 2254. Under step one, a court discerned whether

Congress had directly spoken to the precise question at issue, and if congressional intent was

clear, that ended the inquiry. *Id.* Under step two, if a court determined that the statute was silent

or ambiguous with respect to the specific issue at hand, the court deferred to the agency's

interpretation if it was based on a permissible construction of the statute. *Id.*

In *Loper Bright*, the Court held that mere ambiguity in the statute is not a delegation of

law interpreting power to the agency and that "{c}ourts must exercise their independent

judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 2273.

Although the Court overruled step two of the *Chevron* framework, in which courts deferred to

agencies' reasonable interpretation of silent or ambiguous statutes, the Court instructed:

> In exercising such judgment, though, courts may—as they have
> from the start—seek aid from the interpretations of those
> responsible for implementing particular statutes. Such
> interpretations "constitute a body of experience and informed
> judgment to which courts and litigants may properly resort for
> guidance" consistent with the {Administrative Procedures Act}.

*Id.* at 2262 (quoting *Skidmore v. Swift & Co*, 323 U.S. 134, 140 (1944)). Further, in cases when

a statutory ambiguity implicates a technical matter, the Court observed:

> the court will go about its task with the agency's "body of
> experience and informed judgment," among other information, at
> its disposal. And although an agency's interpretation of a statute
> "cannot bind a court," it may be especially informative "to the
> extent it rests on factual premises within {the agency's} expertise."

11

> Such expertise has always been one of the factors which may give
> an Executive Branch interpretation particular "power to persuade,
> if lacking power to control."

*Id.* at 2267 (quoting *Skidmore*, 323 U.S. at 140; *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)).  Thus, courts are informed by agencies' interpretations and experience with statutes that Congress has entrusted them to administer.

The Court also recognizes instances when a statute either expressly or impliedly authorizes an agency to exercise discretion:

> the statute's meaning may well be that the agency is authorized to
> exercise a degree of discretion. Congress has often enacted such
> statutes.  For example, some statutes expressly "delegate{}" to an
> agency the authority to give meaning to a particular statutory term.
> Others empower an agency to prescribe rules to fill up the details
> of a statutory scheme, or to regulate subject to the limits imposed
> by a term or phrase that leaves agencies with flexibility, such as
> appropriate or reasonable.

*Loper Bright*, 144 S. Ct. at 2263 (internal citations and quotation marks omitted).  In those instances, reviewing courts "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries."  *Id.* at 2247 (internal citations and quotation marks omitted).

Additionally, the Court directed that earlier cases relying on *Chevron* remain good law. *See id.* at 2273 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)).  Thus, precedent sustaining Commerce's interpretation of the antidumping and countervailing duty statutes remains in effect under the principle of *stare decisis* even if a court had reached its prior decision under step two of the *Chevron* analysis.

Finally, *Loper Bright* construed the APA, which "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action, . . . —even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." 144 S. Ct. at 2261 (quoting 5 U.S.C. § 706) (emphasis in original). Unlike *Loper Bright*'s reliance on the APA, the standard of review for Commerce's antidumping determinations lacks any similar admonition. 19 U.S.C. § 1516a(b)(1)(B)(i) (standard limited to setting aside determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

## II.    Commerce's Decision To Use Cohen's *d* As Part Of Its Differential Pricing Analysis Is Supported By Substantial Evidence And Otherwise In Accordance With Law

### A.    Relevant Statuary Framework Of Differential Pricing Analysis Methodologies

The Tariff Act of 1930, as amended (the Act), establishes a remedial regime to combat unfair trade practices. The antidumping provisions of the Act provide relief for domestic manufacturers by imposing duties upon imports of foreign products that are sold in the United States at less than fair value. 19 U.S.C. § 1673. As such, in an investigation, Commerce must evaluate whether imported products are sold in the United States at unfairly low prices. 19 U.S.C. § 1673; *see also Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013). If Commerce concludes that the U.S. sales are "at less than fair value"—meaning that the product is dumped into the U.S. market, it will direct U.S. Customs and Border Protection to assess an "antidumping duty." 19 U.S.C. § 1673(B). A sale is at "less than fair value" when, in general, the price charged in the U.S. market—the "U.S. price"—is less than the price charged in the home market—the "normal value." *See* 19 U.S.C. § 1677b(a)(l)(B)(i); 19 U.S.C.

§§ 1677a(a), (b).  The antidumping duty is equal to the "amount by which the normal value exceeds the {U.S. price} for the merchandise."  19 U.S.C. § 1673(2)(B).

In determining whether subject merchandise is being sold at less than fair value, Commerce employs two primary methods.  The first method is the average-to-average method. Commerce compares "the weighted average of the normal values to the weighted average of the export (and constructed export prices) for comparable merchandise" unless it determines another method is appropriate.  19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  Under this average-to-average method, Commerce compares the weighted average of a respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period.  *See* 19 C.F.R. § 351.414(b)(1).

One downside of the average-to-average method is that it may fail to detect instances of "targeted" or "masked" dumping.  Masked dumping occurs when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods.  *See Stupp III*, 5 F.4th at 1345 (citing *Apex*, 862 F.3d at 1341.  When Commerce uses the average-to-average method, higher-priced U.S. sales can mask these lower-priced U.S. sales that are dumped which could leave the domestic industry without a remedy from unfair trade practices.  *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (SAA) at 842 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").  In

an investigation, if dumping is masked, then the domestic industry may not receive the relief that the statute affords.

The second approach Commerce may take is the average-to-transaction method. Congress specifically addressed this problem of masking by enacting 19 U.S.C. § 1677f-1(d)(1)(B).  *See Stupp III*, 5 F.4th at 1345 (citing *Apex*, 862 F.3d at 1347).  Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the normal values to {U.S. prices} of individual transactions for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the average-to-average method or transaction-to-transaction method}." 19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).  Congress did not specify the method Commerce should use to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time.  The SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another."  SAA at 842-843.  Thus, Commerce must then justify and employ the appropriate methodology based on the record facts and the nature of the merchandise under review.

### B.    Commerce's Use Of Differential Pricing Analysis

To determine whether there is a pattern of prices that significantly differs across purchasers, regions, or time periods, Commerce devised its "differential pricing analysis."  *See Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351, 33,352 (Dep't of

Commerce June 4, 2013) and accompanying IDM at Comment 3; *Xanthan Gum from Austria*, 78

Fed. Reg. 33,354, 33,355 (Dep't of Commerce June 4, 2013).[2]

Commerce employs a three-part test to address the statutory requirements under

19 U.S.C. § 1677f-1(d)(1)(B).  First, Commerce applies the "Cohen's *d* test" to measure whether

for comparable merchandise, the weighted-average of the price to a particular purchaser, region,

or time period differ significantly from the weighted-average of the price to all other purchasers,

regions or time periods.  *Stupp Corp. v. United States,* 619 F. Supp. 3d 1314, 1322 (Ct. Int'l

Trade 2023); *see also* Appx003002-0030003; applied at Appx0085806-0085807.  Second, the

ratio test calculates the proportion of the respondent's U.S. sales, by value, which "pass" the

Cohen's *d* test, to determine if a "pattern" exists.  *Id*.  If 33 percent or less of respondent's sales

pass, then Commerce finds that no pattern exists and uses the average-to-average method.  If

more than 33 percent but less than 66 percent of the respondent's sales pass, then Commerce

finds that a pattern exists and as an alternative comparison method, applies the average-to-

transaction method to those U.S. sales passing the Cohen's *d* test, and the average-to-average

method to the remainder, subject to the third test—the "meaningful difference test." *Id*.  If 66

percent or more of the respondent's U.S. sales pass, then Commerce finds that a pattern exists

and as the alternative comparison method applies the average-to-transaction method to all U.S.

sales, but only if the meaningful difference test is met.  *Id*.

Third, if more than 33 percent of sales passed the ratio test, Commerce conducts the

meaningful difference test to determine whether the average-to-average method can account for

---

[2]  Prior to 2013, Commerce applied several other tests such as the Nails test.  *See e.g.,*
*Apex*, 862 F.3d at 1328 ("Applying a court-sanctioned methodology knows as the Nails test,
Commerce identified for Apex a pattern of targeted sales that differed significantly from prices
of non-targeted sales." (internal citations omitted)).

the disparate pricing.  *Id*. at 1323.  Commerce applies the meaningful difference test by comparing a respondent's weighted-average dumping margin using both the average-to-average method and the appropriate alternative comparison method.  *Id*.  If the average-to-average rate is below the de minimis threshold and the rate from the alternative comparison method is greater than the de minimis threshold, or if both rates are above the de minimis threshold and differ by 25 percent or more, Commerce may then resort to use of the alternative comparison method to calculate the respondent's weighted average dumping margin.  Otherwise, Commerce applies the average-to-average method to all U.S. sales.  *Id*.

This case concerns Commerce's use of the Cohen's *d* test, which involves comparing the product-specific prices of a "test group" to the prices of the "comparison group."  *Stupp III*, 5 F.4th at 1346.  For each purchaser, region, and time period, Commerce segregates the respondent's U.S. sales for comparable merchandise into two groups, where the "test group" includes all sale prices of comparable merchandise to a given purchaser, region, or time period, and where the "comparison group" includes all other sale prices of comparable merchandise.  *Id*. "{C}omparable merchandise is defined using the product control number {CONNUM} and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between {export price} or {constructed export price} and NV for the individual dumping margins."  Appx003002; *see also* Appx085809-085810 (explaining that when calculating information using comparable merchandise, Commerce employed a comparison based on the product control number or CONNUM.  For example, Commerce would segregate sale prices of comparable merchandise to a particular customer (a test group) and compare them to all remaining sale prices of comparable merchandise to all other customers (a comparison group).  Commerce then calculates the means and standard deviations of the sales

prices in each of the test and comparison groups.  Appx003002; *see also* Appx085813.

Commerce then calculates a Cohen's *d* coefficient by dividing the difference in the groups' mean

prices by an average of the standard deviation of the prices in each group.  Appx003002.

Commerce calculates the Cohen's *d* coefficient for each test group to determine whether

the prices to that test group differs significantly from all other prices of comparable merchandise.

If the *d* value of a test group is equal to or greater than the "large threshold," or 0.8, then the

prices within that test group are found to have "passed" the Cohen's *d* test and the prices differ

significantly from the other prices of comparable merchandise.  As explained earlier, even if the

sale prices of a particular test group pass the Cohen's *d* test, it does not mean that Commerce will

apply an alternative comparison method because the sales passing Cohen'*s d* test must be

sufficiently numerous to also pass the ratio test demonstrating that a pattern exists.  Furthermore,

Commerce must determine that the standard average-to-average method cannot account for the

price differences that are the result of the respondent's pricing behavior in the U.S. market.  The

Federal Circuit has already sustained both the ratio and meaningful difference tests.  *Stupp III*, 5

F.4th at 1355-56, and this Court has routinely sustained Commerce's application of the Cohen's

*d* test.  *See, e.g., Stupp,* 619 F. Supp. 3d at 1317 (appeal pending); *SeAH Steel Corp. v. United

States*, 619 F. Supp. 3d 1309, 1313 (Ct. Int'l Trade 2023).

### C.    Commerce Lawfully Applied Its Differential Pricing Analysis In Evaluating Tainai's United States Sale Prices

Here, Commerce lawfully applied the differential pricing analysis in evaluating Tainai's

U.S. sale prices.  Commerce found that 69 percent of the value of Tainai's U.S. sales passed the

Cohen's *d* test.  Appx003134; Appx085760.  Applying the results of the differential pricing

analysis overall, Commerce relied on the alternative comparison method based on the average-

to-transaction method to all U.S. sales to calculate Tainai's weighted-average dumping margin.

*Id*. Commerce determined that the average-to-average method does not account for the potential masked dumping because the weighted-average dumping margin crosses the de minimis threshold when calculated using the average-to-average method and when calculated using an alternative comparison method based on applying the average-to-transaction method to all U.S. sales. Appx003003, Appx003130-003134. Commerce does this to unmask harmful dumping which may appear on the surface as de minimis, but when put onto a proportional scale, has a negative effect on domestic producers.

Tainai argues that Commerce's use of its differential pricing analysis was unjustified, and that Commerce should have applied the average-to-average method. Tainai Br. at 9-10. Tainai argues that the facts underlying this administrative review do not support finding that prices differ significantly among purchasers, regions, or time periods because of the small differences in the price changes for its products and because Commerce failed to account for the differences in the type of products. *Id*. at 10-11. As explained below, Tainai's arguments fail to demonstrate that Commerce's final decision is contrary to law or unsupported by substantial evidence.

1.    **Commerce Conducted The Cohen's *d* Test Using Comparable Merchandise**

First, Tainai claims that the facts underlying this administrative review do not support finding that there are significant differences in the sale prices between purchasers, regions, or time periods in accordance with the statute. Tainai Br. at 9; 19 U.S.C. § 1677f-1(d)(1)(B)(i). Tainai contends that Commerce failed to consider the differing "nature" of its products in its differential pricing analysis. Tainai Br. at 10. Specifically, Tainai argues that the "sizes and costs of the products {in this proceeding} are diverse" and that these differences will necessarily "have a significant variance in price because of their size." *Id*. Tainai reasons that "the analysis should be conducted on a CONNUM basis to avoid the nature of the goods resulting in an

19

inaccurate finding of differences." *Id*. Tainai also provides a table to support its claims that Commerce identified price differences related to the physical characteristics instead of identifying price differences associated with "purchasers, regions, or periods of time." *Id*. at 12-14. With this support, Tainai concludes that Commerce wrongfully relied on the average-to-transaction method because where "the data is clear and straightforward, there is no reason for the Department to resort to a Cohen's *d* analysis, and it should examine the data to determine whether the statutory test . . . has been met." *Id.* at 15. Tainai then posits that if the Court examines the data, it will be clear that "there are no significant price variances as a result of customer, region, or time." *Id.*

Tainai misapprehends the purpose of Commerce's Cohen's *d* test and how it addresses the statutory mandate. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(i). Tainai primarily misses the point that examination of the aggregated U.S. sales, not compared to anything, is exactly what Commerce is trying to address in its differential price analysis. Tanai's proposed methodological approach is at dissonance with the language of 19 U.S.C. § 1677f-1(d)(1)(B)(i), which instructs Commerce to determine the significance of price differences among purchasers, regions or time periods. Moreover, Tainai's allegations are factually inaccurate, relying on an incomplete analysis chart and misreading Commerce's decision which did use CONNUMs in its analysis of U.S. price differences, and fails to provide any additional reasoning in support of its argument that the results of Commerce's Cohen's *d* test are unsupported by substantial evidence.

Section 1677f-1(d)(1)(B)(i) of the statute allows Commerce to "compare the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if (i) there is a pattern of export prices (or constructed export prices) for *comparable merchandise* that differ significantly among purchasers, regions,

or periods of time." (emphasis added). Section 1677f-1(d)(1)(B)(i) does not direct how Commerce measures whether there is a pattern of prices that differs significantly; however, Commerce relies on its differential pricing analysis to conduct this statutory analysis.

As mentioned above, Commerce's first step of its differential pricing analysis is to apply the Cohen's *d* test using *comparable merchandise*. Appx003001-003002. "To determine a pattern of export prices for *comparable merchandise* that differ significantly among purchasers, regions, or periods of time, Commerce used the *Cohen's d* test." *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 (Fed. Cir. 2020) (emphasis added). "Comparable merchandise is defined using the product control number {the CONNUM} and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between {export price} or {constructed export price} and {normal value} for the individual dumping margins." Appx003002; *see also Dillinger France*, 981 F.3d at 1326 ("'Comparable merchandise' was defined by product control numbers ('CONNUMs'), which have certain 'physical characteristics' that were subject to notification and comment during Commerce's investigation."). More specifically, Commerce conducts the Cohen's *d* test using the CONNUMs of the reported U.S. sales. Appx003002; Appx001026 (citing Appx085759-085760, and Appx086034-086044); *see also* Appx085809-085810.

Despite Tainai claims that Commerce failed to properly use comparable products in its differential pricing analysis, Tainai Br. at 10, Commerce did exactly what Tainai posits that it should have done it. When Tainai passingly argued this in its administrative case brief, Commerce simply explained that Tainai's argument is "moot because the Cohen's *d* test already incorporates CONNUM classification into the analysis." Appx003133. Commerce's conclusion is supported by the record. Commerce's Cohen's *d* memorandum references an attachment that

21

describes the program log that Commerce employs which clearly sets the groundwork for a CONNUM analysis. Appx085810. In Commerce's application, it describes the test groups employed in its analysis using a control number for Tainai's products. Appx086034. Then Commerce conducts the base group calculations again using the control numbers of the products. Appx086036.

The CONNUMs reported in Tainai's U.S. sales data comprise of the physical characteristics, which were first established in the investigation after all interested parties had an opportunity to comment and were identified by Commerce at the beginning of the administrative review. Appx001315-001316. The reported physical characteristics include several identifying variables of the subject merchandise including a product description of the subject merchandise that identifies the components like the hub assembly, hub unit, cup, cone, cone assembly, the outer diameter and inner diameter of the component, and the total weight of the finished product with and without packing. *Id*.

If Tainai is arguing that Commerce did not incorporate enough data into its CONNUM analysis, Tainai was given an opportunity early in this administrative review to report any physical characteristics not identified by Commerce; yet, Tainai did not identify any additional physical characteristics that were relevant to accurately define the subject merchandise and foreign like product. Appx001314 (stating "{f}ields numbered 3.1 to 3.9 specify the product characteristics requested by Commerce. You may add additional product characteristics. However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that Commerce should use this information to define identical and similar merchandise."). Accordingly, Commerce considered the "different nature of the goods" in its Cohen's *d* analysis, and provided Tainai an opportunity to report any additional physical

characteristics not already considered by Commerce.  Commerce rightly concluded that Tainai's argument is moot.

### 2.    Tainai's Own Analysis Of Its Sales Simply Masks Dumping

Second, Tainai posits that its own analysis demonstrates that Commerce has failed demonstrate "significant difference{s}based on customer, region, or time."  Tainai Br. at 11. Tainai includes a table in its brief purporting to support its claims that there are no significant price differences in its reported U.S. sales based on purchasers, regions, or time periods, and argues that Commerce should instead calculate its weighted-average dumping margin using the average-to-average method.  Tainai Br. at 11, 15.  Tainai's Table CB-2, however, includes an overly simplistic analysis of CONNUM-specific price changes during the period of review. Tainai Br. at 15 (in referencing the table, Tainai argues "the data establishes by clear and convincing evidence that there are no significant price variances as a result of customer, region or time, and thus the condition to use an alternate calculation method has not been satisfied."). Tainai further contends that the price changes of its U.S. sales are "inherently not significant as such change{s are} in a range of less than 10 percent and the majority of such changes only occurred a single time."  *Id*. at 11.  Tainai contends that Commerce's differential pricing analysis wrongfully concludes the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.

As an initial matter, Tainai provided a similar table during in the underlying administrative review, *see* Appx0086128-0086129, to support its argument that Commerce failed to consider comparable merchandise in the differential pricing analysis by not analyzing prices on a CONNUM-specific basis.  Appx086129; *see also* Appx003131.  As mentioned above, Commerce determined that Tainai's arguments were moot because "the Cohen's *d* test already

incorporates CONNUM classification into the analysis," and, thus, did not address the table specifically.  Appx003133.

Before this Court, Tainai uses the table again to argue for a methodology considering the CONNUM classifications, but also makes "a number of additional points."   Tainai Br. at 11. Tainai argues that the data it presents demonstrates that there were only four products out of 40 with more than two price changes and only one had three price change during the period of review.  *Id.*  It further argues that of the price increases, these price increases were minimal—less than 10 percent increases.  *Id.*  But these additional points unveil a simplistic analysis that constitutes a cherry-picked analysis of Tainai's sales, unbound by the strictures of the statutory framework or Commerce's precedent sustained by this Court.

Tainai's Table CB-2 does not appear to conduct an analysis consistent with section 1677f-1(d)(1)(B)(i).  Indeed, Tainai's Table CB-2 simply identifies the changes in gross unit prices, by CONNUM, during the period of review without regard to customers, regions, or time periods.  *Id*. at 13-14.  Notably, Tainai provides no analysis to demonstrate whether these prices indicate that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time . . ."  *Id*. at 11-15; *see also* § 1677f-1(d)(1)(B)(i).

Tainai also explains that any price changes were marginal since they were under 10 percent.  Tainai Br. at 11.  However, Tainai fails to demonstrate why the purported gross unit price differences of up to 10 percent are not significant or that the statute requires not only that prices differ significantly but also that the majority price changes must occur multiple times.  *Id*. at 11-15.  Under Tainai's analysis, it is impossible to tell if a 10 percent increase is actually significant across purchasers, regions, or periods of time.

Table CB-2 is also incomplete as it failed to include all U.S. sale prices reported during the period of review.  *Compare* the 40 CONNUMS listed at in Table CB-2 with Appx081262, exhibit C-2, as referenced at Appx081202-081203, which purports to list all CONNUMs and products sold in the United States.  Indeed, Tainai did not include CONNUM [

], listed at number 31 in Exhibit SD-5 at Appx085089; *see also* Appx085758, which consists of significant portion of reported U.S. sales.  Notably, unlike many of the CONNUMs included in Table CB-2, the price of the missing CONNUM changed repeatedly during the period of review.  Appx086130; Attachment 1 (at the GRSUPRU column with any change in price highlighted).[3]  In other words, Tainai selectively presents partial data, while omitting other data which undermine its arguments.  Tainai makes no mention of this omission, the effect on its analysis, or whether the missing sales could still permit an analysis that could constitute a pattern.  *See* Tainai Br.  Presentation of data in this way, comparing the data with itself and not a test group creates what Commerce explained in *Stupp III*, that "{t}he average-to-average method, however, sometimes fails to detect 'targeted' or 'masked' dumping, because a respondent's 'sales of low-priced 'dumped' merchandise would be averaged with (and offset by) sales of higher-priced 'masking' merchandise, giving the impression that no dumping was taking place.'"  5 F.4th at 1345 (citing *Apex*, 862 F.3d at 1341).

---

[3]  Attachment 1 is a screenshot of the "Sales Database 2021-2022" sheet of an Excel workbook Tainai submitted as its U.S. sales database at Ex. CB-1 (Aug. 8, 2023).  The screenshot includes Tainai's U.S. Sales Database with a filter for CONNUM [

] and prices are highlighted to demonstrate the various price changes of the omitted CONNUM.  The native Excel spreadsheet was not amenable to being converted to pdf since it is voluminous and also cannot be filed using the ECF system.  A cover sheet was provided in the appendix for the data.  Should the Court require filing of the Excel workbook, Commerce would file by CD-ROM under separate cover.

Moreover, as stated above, Commerce's Cohen's *d* analysis measures the differences in the weighted-average prices of the test and comparison groups.  Appx003132 ("When the difference in the weighted-average sale prices between the two groups is measured relative to the variances in prices within the two groups, then this value is expressed in standardized units and based on the dispersion of the prices within each group."); *see also Dillinger France*, 981 F.3d at 1324 n.5 ("The average-to-transaction method compares weighted average of the normal values to the export prices of individual transactions for comparable merchandise.").  Indeed, Tainai confuses the difference between finding that sales are made at significantly different prices, and the complete process through which Commerce determines whether to apply an alternative comparison method.  "Congress delegated to Commerce the authority to determine where a price difference is significant".  *See Stupp,* 619 F. Supp 3d at 1327 (citing 19 U.S.C. § 1677f-1(d)(1)(B)(i)).  Far from setting a rigid numerical threshold which Tainai appears to advocate, the definition of a "significant price difference" would depend on the product at issue.  *See* SAA at 843 ("Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.").

Thus, Congress entrusted Commerce to use its expertise and knowledge of pricing to gauge price differences.  *See Fujitsu General*, 88 F.3d at 1039 (granting Commerce significant deference in determinations "involv{ing} complex economic and accounting decisions of a technical nature").

## III.    Commerce's Application Of The Differential Pricing Analysis Has Not Been Disturbed By The Supreme Court's Decision In *Loper Bright*

Congress gave Commerce the power to use the differential pricing analysis in 19 U.S.C. § 1677f-1(d)(1)(B)(i).  Strictly speaking, Congress provided this power in the context of less than fair value investigations, however Commerce's use of differential pricing analysis in

administrative reviews has already been sustained by the Federal Circuit in *JBF RAK*, 790 F.3d at 1364.  This fact is recognized by Tainai.  Tainai Br. at 16-17.

Despite this recognition, Tainai posits that Commerce's application of differential pricing analysis is unlawful due to the Supreme Court's rejection of the *Chevron* deference in its decision in *Loper Bright* which the Court in *JBF RAK* relied upon in making its decision.  *Id.* at 17-18.  Tainai also explains that the fact Congress did not include the term review in the statute, means that the application of the statute is thus confined to only investigations.  *Id.* at 18 (stating "{t}he fact that the legislature did not include reviews, knowing that such reviews were being conducted, is clear evidence that it did not intend reviews to be subject to differential pricing analysis.").  However, in all of these points, Tainai errs.

### A.    *Loper Bright* Did Not Disturb Existing Precedent

First, the Supreme Court's decision in *Loper Bright* does not undermine the Federal Circuit's affirmance of Commerce's differential pricing analysis.  The Supreme Court's decision in *Loper Bright* did not invalidate all prior judicial precedent that invoked *Chevron* as Tainai's claims.  Tainai Br. at 17.  To the contrary, the Supreme Court held that prior cases, which relied on *Chevron*, remain good law and remain subject to statutory *stare decisis*:

> {H}owever, we do not call into question prior cases that relied on the Chevron framework.  The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory stare decis despite our change in interpretive methodology.  *Mere reliance on Chevron cannot constitute a "special justification" for overruling such a holding*, because to say a precedent relied on Chevron is, at best, just an argument that the precedent was wrongly decided.  That is not enough to justify overruling a statutory precedent.

*Loper Bright*, 144 S. Ct. at 2273 (emphasis added).  Thus, precedent sustaining Commerce's interpretation of the antidumping and countervailing duty statutes remains in effect under the

principle of *stare decisis* even if a court had reached its decision under step two of the *Chevron* analysis.

Tainai fails to recognize authority for Commerce's determination of the appropriate comparison methodology in an administrative review. The statute itself does not specify what comparison method Commerce must use in calculating the weighted-average dumping margin in administrative reviews. 19 U.S.C. § 1675; *JBF RAK LLC v. United States,* 991 F. Supp. 2d 1343, 1348 (Ct. Int' Trade 2014) (explaining that the statute is "silent" on this precise question). The statute does not prohibit Commerce from adopting the same framework for choosing a comparison method in an administrative review as the one that the statute requires in an investigation. 19 U.S.C. § 1677f-1(d)(1)(B). Similarly, the SAA does not limit the proceedings in which Commerce may consider an alternate comparison method when an average-to-average method cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods. *See SAA* at 842-43. In *JBF RAK*, the Federal Circuit held that Commerce may use the same comparison methodologies for uncovering masked dumping in both an investigation and an administrative review: "Commerce's decision to apply its average-to-transaction comparison methodology in the context of an administrative review is reasonable." *JBF RAK,* 790 F.3d at 1363-65; *see also JBF RAK*, 991 F. Supp. 2d at 1348 ("It is logical for Commerce to borrow the comparison methodologies it uses to uncover dumping in investigations and apply those same methodologies in administrative reviews"). Under *Loper Bright*, this Federal Circuit precedent remains good law, and this Court must sustain Commerce's practice here. *See JBF RAK*, 790 F.3d at 1364 (citing 19 C.F.R. § 351.414(c)(1) (emphasis in original) ("*in an investigation* or review, {Commerce} will use the average-to-average method unless {it} determines another method is appropriate in a particular case.")

**B.**    ***Loper Bright* Has Not Disturbed The Discretion Granted To Commerce By Statute**

Second even if Tainai's arguments were not barred by the foregoing Federal Circuit precedent, which it is, to the extent there is any gap or ambiguity in the statute, Congress delegated authority to Commerce to fill it.  Unlike a straightforward application of *Loper Bright* in a case of statutory ambiguity*,* here the statute does not dictate to Commerce what methodology it should employ, giving it discretion to determine the appropriate methodology. The Supreme Court explained that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion.  Congress has often enacted such statutes." *Loper Bright*, 144 S. Ct. at 2263.  Such statutes include those that "empower an agency to prescribe rules to fill up the details of a statutory scheme or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Id.* (cleaned up).  Thus, even if this Court decides it is necessary to interpret the statute, the text of the statute authorizes Commerce's discretion.  Statutory terms that are "general in nature, indicat{e} that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024).

Congress did not mandate how Commerce should determine under 19 U.S.C. § 1677f-1(d)(1)(B) if there is a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  The text of the statute indicates that Congress gave Commerce flexibility by its use of the open-ended term "differ significantly." *Loper Bright*, 144 S.Ct. at 2263.   An open-ended qualifier "significantly" is akin to terms "appropriate" or "reasonable."  *See Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (discussing open-ended terms like "reasonable," "appropriate," "feasible," or "practicable"); *see*

29

*also Loper Bright*, 144 S.Ct. at 2263.  Congress' directive to Commerce to determine not merely whether prices differ, but whether they differ "significantly" necessarily provides Commerce with flexibility to assess the degree of difference depending on the facts of each particular case. Congress did not prescribe how Commerce should determine what is significant allowing Commerce to make its determinations on a case-by-case basis.   Congress's wording makes sense because "differ significantly" for each valuation depends on the factual record before Commerce.

The use of the phrase "differ significantly," like the terms "appropriate" and "reasonable," accords Commerce discretion insofar as its interpretation remains within the bounds of the statute.  *See Loper Bright*, 144 S. Ct. at 2263.  This discretion is made clear by the statute which predicates the relevant section with the "administering authority may determine". 19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added).  Finally, the context in which the phrase "differ significantly" appears within the statute supports the conclusion that Congress afforded flexibility to Commerce.  Specifically, section 1677f-1, which sets forth the sampling and averaging process, grants significant discretion to Commerce.

Congress's intent to delegate discretion was also recognized in *United States Steel Group v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996).  The Federal Circuit there explained that in the context of 19 U.S.C. § 1677(7)(C)(iii) (1988), when "Congress has crafted an intricate statute, and committed its enforcement to the Department of Commerce and the International Trade Commission" the "factual conclusions of each commissioner will drive the legal conclusion."  Further, "{t}he invitation to employ such diversity in methodologies is inherent in the statutes themselves, given the variety of the considerations to be undertaken and the lack of

any Congressionally mandated procedure or methodology for assessment of the statutory tests."

*U.S. Steel*, 96 F.3d at 1362.  Notably this case did not rely on *Chevron*.

This principle is why Tainai's argument regarding *expression unius exclusion alterius* is not availing.  Tainai argues that since Congress did not add the word "review" into 19 U.S.C. § 1677f-1(d)(1) this means that it excluded any other proceeding from using the average-to-transaction method.  Tainai Br. at 18.  Nor does Tanai's citation to an argument found in the Federal Circuit's opinion in *JBF Rak* avail it anything.  Tainai appears to parrot an argument raised before the Federal Circuit about Article 2.4.2 of the SAA which states that "in investigations (not reviews), national authorities normally will establish dumping margins by comparing either: a weighted-average of normal values to the weighted-average of export prices of comparable merchandise; or normal value and export price on a transaction-to-transaction basis."  SAA at 810.  Tainai notes that reviews were not included in this passage, however, Tainai's argument fails because the cited passage speaks only to the comparison methods that Commerce may use in investigations.  SAA at 810.  It does not address specifically what mechanisms Commerce may use to make comparisons between normal value and export prices or constructed export prices in administrative reviews.  *Id.*  The Federal Circuit noted this in rejecting this argument explaining that "this passage fails to address what methods Commerce may use to make comparisons between normal value and export price or constructed export price in *administrative reviews;* it addresses investigations only."  *JBF RAK*, 790 F.3d at 1364 (emphasis in original).

What Tainai calls for is a rigid approach that this Court should not dictate.  As the Federal Circuit explained

> {t}his court has no independent authority to tell the Commission
> how to do its job.  We can only direct the Commission to follow

> the dictates of its statutory mandate. So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable."

*United States Steel*, 96 F.3d at 1362. Tainai "seeks a ruling from this court that there should be single methodology" and the statute on its face compels no such uniform methodology." *Id.* at 1361-62. Thus, this Court should reject Tainai's argument that Commerce is thus prevented from applying its pricing differential analysis in the context of reviews when the plain language of the statute provides no such prohibition. *See Stanley Works*, 279 F. Supp. 3d at 1185 (The statute at issue "does not mandate how Commerce is to conduct its targeted dumping analysis.").

Further, although *Loper Bright* overruled *Chevron* deference to agency interpretations of silent or ambiguous statutes under the APA, it did not disturb the Federal Circuit's longstanding recognition that Commerce's determinations in antidumping and countervailing duty matters are entitled to deference *distinct* from *Chevron* due to the Act's complex and technical nature. *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,* 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (recognizing "deference {that} is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise"); *Fujitsu General*, 88 F.3d at 1039 (same); *Smith-Corona Group v. United States*, 713 F.2d 1568, 1582 (Fed. Cir. 1983) (holding that "review of the statute reveals tremendous deference to the expertise of {} Commerce in administering the antidumping law").

Indeed, the statutory scheme reinforces that Congress intended to delegate significant discretion to Commerce in its implementation of the antidumping duty laws. For example, in the Uruguay Round Agreements Act (URAA), which enacted 19 U.S.C. § 1675(c), Congress expressly approved the SAA, designated the SAA an "authoritative expression by the United

States concerning the interpretation and application of" the URAA.  19 U.S.C. § 3512(d).

Similarly, the URAA delegated authority to "Commerce to adopt 'such regulations as may be

necessary to ensure that any provision of {the URAA}, or amendment made by {the URAA},

that takes effect on the date any of the Uruguay Round Agreements enters into force with respect

to the United States is appropriately implemented on such date.'" *Comm. Overseeing Action for

Lumber Int'l Trade Investigations or Negots. v. United States*, 66 F.4th 968, 977 (Fed. Cir. 2023)

(quoting 19 U.S.C. § 3513(a)(2)) (bracketing by Court).

 The broad discretion that Commerce enjoys in its implementation of antidumping and

countervailing duty legislation flows from the "intricate framework" established by the Tariff

Act of 1930, as amended, and Congress's inability to anticipate in legislation every possible

intricacy.  *See Smith-Corona Group*, 713 F.2d at 1571 (decided a year prior to *Chevron*); *see

also Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984) (holding that

Commerce has broad discretion when filling statutory gaps because there is no "prescient

Congress . . . devoting a majority of its effort to writing statutes on the daily management of our

international trade relations, including much of what may be considered administrivia."). "The

number of factors involved, complicated by the difficulty in quantification of these factors and

the foreign policy repercussions of a dumping determination, makes the enforcement of the

antidumping law a difficult and supremely delicate endeavor." *Smith-Corona Group*, 713 F.2d at

1571.  Thus, while the Tariff Act of 1930, as amended, imposes certain "general standards" that

must be followed, within the statutory framework, Commerce "has been entrusted with

responsibility for implementing the antidumping law {and t}he Secretary has broad discretion in

executing the law."  *Id.*

Here, Commerce's analysis was "intertwined with the agency's factfinding" and it is also entitled to deference for that reason. The Supreme Court recognized in *Loper Bright* that deference may also be owed to "factbound determinations" where "application of a statutory term was sufficiently intertwined with the agency's factfinding." *See* 144 S. Ct. at 2259-60. Commerce here used its discretion and applied the facts to this case which guided its determination, which should be sustained.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's final results and deny Tainai's motion.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

s/ Tate N. Walker
TATE N. WALKER
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:    (202) 307-0163
Email: Tate.Walker@usdoj.gov

OF COUNSEL:

JESUS N. SAENZ
Attorney
Office of the Chief Counsel for Trade
Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

November 14, 2024

*Attorneys for Defendant*

34

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 9,844 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

s/Tate Walker
Tate Walker

# ATTACHMENT 1



| OBSNUM | PRODCODU | CONNUMU | PRODCTU | CUSCODU | SALETERU | PAYTERMU | QTYU | QTUMU | GRSUPRU | TA|
|--------|----------|---------|---------|---------|----------|----------|------|-------|---------|----|