A-570-601
Remand
Ct. No. 24-00025
**Public Version**
E&C/OII: JX

**Shanghai Tainai Bearing Co., Ltd., et al. v. United States,**
**Court No. 24-00025 (CIT August 28, 2025)**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court,

or CIT), issued in *Shanghai Tainai Inc. v. United States*, Court No. 24-00025 (CIT August 28,

2025) (*Remand Order*), to reconsider its differential pricing analysis consistent with the decision

by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Marmen Inc. v. United*

*States*.[1]  This action arises out of the 2021-2022 administrative review of the antidumping duty

order on tapered roller bearings (TRBs) from the People's Republic of China (China).[2]

In response to the Court's *Remand Order*, Commerce has reconsidered its application of

the Cohen's *d* test as part of its differential pricing analysis.  As a result of our analysis, we made

changes to the differential pricing analysis; however, Shanghai Tainai, Inc's (Tainai) actual

calculated weighted-average dumping margin did not change from the *Final Results*.[3]

---

[1] *See Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*).
[2] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 1548 (January 10, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review*; 2021–2022, 88 FR 43290 (July 7, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM)..
[3] *See Final Results*, 89 FR at 1548; *see also* Memorandum, "Final Results of Redetermination Calculation Memorandum for Shanghai Tainai Bearing Co., Ltd.," dated concurrently with this final redetermination (Final Calculation Memorandum).

## II.     BACKGROUND

In the *Final Results*, Commerce calculated a weighted-average dumping margin for Tainai using the alternative average-to-transaction (A-to-T) comparison methodology.[4]  Tainai challenged the *Final Results* and its reliance on the Cohen's *d* test as part of the differential pricing analysis.  Following the Federal Circuit's precedential opinion in *Marmen* and the Court's request for supplemental briefing,[5] Commerce determined that it was necessary to revise its differential pricing analysis and thus stated that a remand would be appropriate.  On August 28, 2025, the Court issued its *Remand Order*.[6]

In *Marmen*, the Federal Circuit held that it is unreasonable for Commerce to use the Cohen's *d* test as part of its differential pricing analysis when that test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous observations.[7]  In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and *that analysis may not rely on Cohen's d test* for data sets like those here {*i.e.*, the data underlying the differential pricing analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[8]  Consequently, Commerce stated a remand would be appropriate to re-perform its differential pricing analysis in the instant administrative review.

---

[4] *See Final Results* IDM at Comment 4.
[5] *See* Order Regarding Stay, dated February 7, 2025, (ECF No. 51) (staying the litigation and requesting supplemental briefing after the issuance of a mandate in *Marmen*).
[6] *See Remand Order* at 1.
[7] *See Marmen*, 134 F.4th at 1348.
[8] *Id.* at 1334 (emphasis added).

On December 9, 2025, Commerce released the Draft Redetermination to all interested parties and invited them to comment.[9]  Tainai filed timely comments on December 15, 2025 and December 18, 2025.[10]

After considering the comments raised by interested parties, we made a change to the Draft Redetermination with regard to Commerce's differential pricing analysis.  Specifically, as explained further below, we have consolidated two separate customer codes as reported in the U.S. sales data as a single purchaser.  However, the final weighted-average dumping margin for Tainai remains 24.78 percent.[11]

## III.    Analysis

### I.    Commerce's Application of the Price Difference Test

Following the Federal Circuit's decision in *Marmen*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[12]  To comply with the Federal Circuit's holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[13]  Additionally, and concurrent with this change, Commerce also discontinued the

---

[9] *See* Draft Results of Redetermination Pursuant to Voluntary Remand, *Shanghai Tainai Bearing Co., Ltd. v. United States*, Court No. 24-25 (CIT August 28, 2025), dated December 9, 2025 (Draft Redetermination); *see also* Memorandum, "Revised Commenting Schedule," dated December 15, 2025 (Commenting Schedule).
[10]  *See* Tainai's Letter, "Comments on Draft Remand Determination," dated December 15, 2025 (Tainai's Comments); *See also* Tainai's Letter, "Supplement to Comments on Draft Remand Determination," dated December 18, 2025 (Tainai's Supplemental Comments).
[11] *See* Final Calculational Memo.
[12] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).
[13] *See* Memorandum, "Calculation Memorandum for the Draft Results of Redetermination," dated December 15, 2025 (Draft Calculation Memorandum).

use of the "mixed method" in administrative proceedings. In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly. Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to the Federal Circuit's decision in *Marmen*, Commerce reconsidered and discontinued its application of the Cohen's *d* test as part of its differential pricing analysis, and, in the alternative, applied the "price difference test," and discontinued the use of the "mixed method," as detailed below.

### i.    Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Tainai's sales of the subject merchandise from China to the United States were made at less than normal value (NV), Commerce compared the constructed export price (CEP) to the NV as described in the "Constructed Export Price" and "Normal Value" sections of the *Preliminary Results*.[14]

### 1.    Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average export prices (EPs) or CEPs (*i.e.*, the average-to-average (A-to-A) method) unless Commerce determines that another method is appropriate in a particular situation. In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the A-to-T method) as an alternative comparison method using an analysis consistent with

---

[14] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 43290 (July 7, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum at 18-20.

section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in an LTFV investigation.[15]

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here.  Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are

---

[15] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F. Supp. 3d 1286 (CIT 2014).

defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the period of review (POR) based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods. If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR.

Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences.  In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method.  If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

## 2.   Results of the Differential Pricing Analysis

For Tainai, based on the results of the differential pricing analysis, Commerce finds that 76.3 percent of the value of U.S. sales pass the price difference test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.[16] Further, Commerce determines that the A-to-A method cannot account for such differences

---

[16] *See* Draft Calculation Memorandum.

because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method.  Thus, for these Final Results of Redetermination, Commerce is continuing to apply the A-to-T method to calculate the weighted-average dumping margin for Tainai.

## IV.    INTERESTED PARTY COMMENTS

In December 2025, Commerce issued its Draft Redetermination and provided interested parties an opportunity to comment.[17]  Commerce received comments from Tainai.[18] We address Tainai's Comments below.  After considering these comments, we have made certain changes to our analysis for these final results of redetermination.

**Comment 1:   Commerce Failed to Provide its Analysis for the Draft Redetermination**

*Tainai's Comments*

The following is a verbatim executive summary of argument submitted by Tainai.  For further details, *see* pages 1 of Tainai's Comments.

> {Commerce} failed to provide its analysis.  In the absence of provision of the analysis of the data, any analysis by {Commerce} must necessarily be rejected.[19]

**Commerce's Position:**  Commerce agrees with Tainai that it failed to provide the Draft Calculation Memorandum when releasing the Draft Redetermination.  Accordingly, after Tainai noted this issue, Commerce released the Draft Calculation Memorandum[20] and provided interested parties with additional time to analyze and respond to Commerce's Draft Calculation Memorandum.[21]

---

[17] *See* Draft Redetermination; *see also* Commenting Schedule.
[18] *See* Tainai's Comments; *see also* Tainai's Supplemental Comments.
[19] *See* Tainai's Comments at 1.
[20] *See* Draft Calculation Memorandum.
[21] *See* Commenting Schedule.

**Comment 2:   Whether Commerce's Draft Redetermination Ignores the Plain Language of the Statue and Facts of Record**

*Tainai's Comments*

The following is a verbatim executive summary of argument submitted by Tainai.  For further details, *see* pages 1-4 of Tainai's Comments.

> {Commerce}'s Draft {Redetermination} ignores the plain language of the statute. {Commerce}'s "conclusion" is unsupported by the data and analysis provided. Such analysis establishes that the price changes were minimal.[22]

**Commerce's Position:**  We disagree with Tainai that the calculations in the Draft Redetermination are flawed and ignore the plain language of the statute and facts of record. Tainai argues that Commerce's replacement for the Cohen's *d* test*,* the price difference test, is flawed because price variations for TRBs are not based on purchaser, region, or time period but on size, design, and components and that the analysis should be performed on a CONNUM-specific basis.[23]  First, we note that *Marmen* and *Stupp* directed Commerce to discontinue use of the Cohen's *d* test because certain statistical criteria were not found to exist in the respondent's U.S. price data in the investigations underlying the Federal Circuit opinions.[24]  Indeed, the statute directs Commerce to determine if "there is a pattern of export prices (or constructed export prices) *for comparable merchandise* that differ significantly among purchasers, regions, or periods of time."[25]  With respect to Tainai's argument that Commerce should not consider the purchaser, region, or time period in its analysis, the Federal Circuit has already rejected

---

[22] *See* Tainai's Comment at 1.

[23] *Id.* at 1-4.

[24] *See, e.g., Marmen*, 134 F.4th at 1348

[25] *See* section 777A(d)(1)(B)(i) of the Act (emphasis added); *see also Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 (Fed. Cir. 2020) ("Comparable merchandise' was defined by product control numbers ('CONNUMs'), which have certain 'physical characteristics' that were subject to notification and comment during Commerce's investigation.").

arguments of this nature, affirming that Commerce is not required to determine why there is a pattern of prices that differ significantly among purchasers, regions, or time periods.[26]

Section {777A(d)(1)(B) of the Act} does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in {AD} investigations for guidance. Here, the CIT did not err in finding there is no intent requirement in the statute, and we agree with the CIT that requiring Commerce to determine the intent of a targeted dumping respondent "would create a tremendous burden on Commerce that is not required or suggested by the statute."[27] Therefore, in arguing that Commerce should disregard price variation based on purchaser, region, or time period, it appears that Tainai is suggesting that Commerce act inconsistently with the statute in its revised differential pricing analysis.

Additionally, we find this argument unpersuasive as Commerce already compares prices on a CONNUM-specific basis (*i.e.*, for "comparable merchandise") when conducting its price difference test.[28] When Commerce applies the price difference test, the test is performed using all of the U.S. sales for each CONNUM, CONNUM by CONNUM, as reported by Tainai in its U.S. sales data. Commerce compares the CONNUM-specific weighted average price of the sales to each purchaser, region or time period to the weighted-average price of all other U.S. sales of

---

[26] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*).

[27] *Id.*, 790 F.3d at 1368 (citing *JBF RAK LLC v. United States*, 991 F. Supp 2d 1343, 1355 (CIT 2014)); *see also Borusan Mannesmann Boru Snayi ve Ticaret A.Ş. v. United States*, 608 Fed. Appx. at 948-49 (Fed. Cir. 2015).

[28] Commerce notes that the comparison of prices in the price difference test is for "comparable merchandise," which includes the product control number (CONNUM). *See* section 777A(d)(1)(B)(i) of the Act ("prices that differ significantly for comparable merchandise"); *see also Preliminary Results* PDM at 17 ("comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP or CEP and NV for the individual dumping margins."). Here, Commerce uses "CONNUM" and "comparable merchandise" interchangeably.

that CONNUM.  Therefore, we find Tainai's assumption regarding the price difference test, where Commerce uses the prices of all sales, *i.e.*, all CONNUMs, is erroneous because the price difference test is already based on the CONNUM-specific comparison of prices.[29]

Tainai further argues the results of the differential price analysis is flawed based on its analysis of the U.S. sale data which "shows that [     ] of the sales were made at one price, [     ] were made at a second price, that [     ] of the sales were made at a third price, [     ] of the sales were made at a fourth price, and [     ] of the sales were made at a fifth price."[30]  Tainai rationalizes that "even though [     ] of sales had NO changes of price during the POR and [     ] changed no more than once, {Commerce} found that 76.3% of the sales 'passed' the price differential test and thus confirmed a pattern of prices that differed significantly."[31]  Tainai's analysis is irreparably flawed, notwithstanding the fact that Commerce's determination is based on the proportion of U.S. sales by sales value, and Tainai's analysis is based on the proportion of U.S. sales by sales quantity.  Tainai states that "[     ] of its sales had NO changes of price during the POR," yet from Exhibit CRC-1, these sales are the *first* price of each product, ***not*** the *only* price.  In fact, the proportion of Tainai's U.S. sales for products with only a single price amount to [               ], not [     ], which means that [     ] by quantity have at least one price change during the POR.  On the other end of the spectrum, for products with five price changes during the POR (*i.e.*, [                    ]), Tainai reports that this accounts for [     ] of total sales quantity.  In fact, the proportion of Tainai's U.S. sales for products with five price changes amount to [               ].  The actual proportion of TRB products with two,

---

[29] *See* Final Calculation Memorandum at Attachment II at 93 to 103.
[30] *See* Tainai Comments at 2 and Exhibit CRC-1.
[31] *Id.* at 3.

three and four different prices over the course of the POR is [        ], [        ] and [        ], respectively.

Tainai's analysis also fails because the price difference test is based on the net U.S. price, not on the gross unit price as used by Tainai in Exhibit CRC-1. Commerce's dumping margin comparisons are based on the net U.S. price, adjusted for billing adjustments, discounts and rebates, movement and selling expenses. Because the results of the differential pricing analysis considers whether the standard average-to-average comparison method can account for the price difference exhibited in a respondent's pricing behavior in the U.S. market, *i.e.*, whether there is masked dumping that is hidden as a results of the standard average-to-average method, the prices used in the pattern requirement of section 777A(d)(1)(B)(i) of the Act, which is to consider whether conditions exist where masked dumping may be occurring, Commerce uses the equivalent net U.S. prices in the price difference test that it uses when calculating individual dumping margins. As the price adjustments also may vary from sale to sale, net U.S. prices will also vary more from sale to sale than do the gross U.S. prices as relied upon by Tainai. Accordingly, Tainai's analysis is not based on the same data as used in Commerce's price difference test.

Moreover, in Tainai's case brief for the *Final Results*, Tainai noted there were a total of [   ] CONNUMs while Tainai now states there are [   ] in Exhibit CRC-1.[32] In its case brief during the underlying administrative review, Tainai noted that no CONNUMs changed prices more than [        ] times, while Tainai now claims no CONNUM changed prices more than [        ] times.[33] Tainai does not explain nor attribute the root of these changes and why its own

---

[32] *See* Tainai's Letter, "Case Brief," dated August 7, 2023, at Exhibit CB-1 (Case Brief); *see also* Tainai's Comments at Exhibit CRC-1.
[33] *See* Case Brief and Tainai's Comments .

data differed from the case brief filed for the *Final Results* to its comments filed after the Draft Redetermination.

Next, Tainai argues that a single price adjustment or two does not constitute a pattern of prices varying significantly among purchasers, regions, and time periods. Tainai argues that one or two price adjustments does not constitute a pattern of prices which vary significantly. [34]

We disagree. While Commerce makes the determination of whether prices differ significantly on a CONNUM-specific basis, we consider the universe of U.S. sale prices when looking for a pattern of prices that differ significantly. Put simply, the number of times that a price changes over the course of a period are not relevant to the analysis. What is relevant is how much the weighted-average price changes between different purchasers, regions or time periods. The extent of the prices that differ significantly across all CONNUMs sold in U.S. market during a POR is what establishes whether a pattern existed during the period.

Therefore, for the final results of redetermination, we have not changed our practice regarding the price difference test portion of the differential pricing analysis from that used in the Draft Redetermination.

**Comment 3:  Differential Pricing Analysis is Not Authorized in Statue in Reviews**

*Tainai's Comments*

The following is a verbatim executive summary of argument submitted by Tainai. For further details, *see* pages 4-7 of Tainai's Comments.

> Differential pricing analysis is not authorized by the statute in review. The language of the statute is quite clear and there is no statutory gap to be filled.[35]

---

[34] *See* Tainai's Comments at 4.
[35] *Id.* at 4-7.

**Commerce's Position:**  We disagree with Tainai that Commerce is not authorized to use differential pricing analysis when conducting an administrative review.  In its comments, Tainai argues that Commerce's basis to apply the A-to-T method in an administrative review was based on *JBF RAK,* where the Federal Circuit sustained Commerce's use of the A-to-T method in an administrative review because of *Chevron* deference.[36]  However, Tainai now contends that because *JBF RAK* relies on *Chevron*, which has since been overturned in *Loper Bright,*[37] Commerce must now rely on the plain language of the statute as defined in section 777A(d)(1)(B) of the Act.[38]  Tainai states the plain language in section 777A(d)(1)(B) of the Act is clear that the A-to-T comparison methodology is only applicable in an investigation, as administrative reviews are never mentioned.[39]  Therefore, Commerce must invalidate the use of the differential pricing analysis and resort to only the A-to-A comparison methodology administrative reviews.[40]

We disagree with this rationale.  Though *Chevron* was overturned, the Supreme Court's holding in *Loper Bright* does not negate prior Federal Circuit holdings utilizing the *Chevron* framework that sustains Commerce's gap-filling discretion by applying a comparison methodology, (*i.e.* the A-to-T comparison methodology).[41]  The Supreme Court stated:

> By overruling *Chevron*, though, the Court does not call into question prior cases that relied on the *Chevron* framework.  The holdings of those cases that specific agency actions are lawful — including the Clean Air Act holding of *Chevron* itself — are still subject to statutory *stare decisis* despite the Court's change in interpretive methodology.  Mere reliance on *Chevron* cannot constitute a '"special justification"' for overruling such a holding, because to say a precedent relied on

---

[36] *Id.* citing (*JBF RAK LLC*, 790 F.3d at 1368; *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984) (*Chevron*).
[37] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 376 (2024) (*Loper Bright*).
[38] *See* Tainai's Comments at 5-6; *see also* U.S.C. § 1677f–1(d)(1)(B)
[39] *Id.* at 6-7.
[40] *Id.*
[41] *See JBF RAK*, 790 F.3d at 1368.

> *Chevron* is, at best, "just an argument that the precedent was wrongly decided." That is not enough to justify overruling a statutory precedent. [42]

Consequently, consistent with Federal Circuit precedent, and in accordance with *Loper Bright,* which "did not call into question prior cases that relied on the *Chevron* framework," we have not changed our practice in these final results of redetermination in regard to whether the A-to-T comparison methodology is lawful in a review as affirmed in *JBF RAK*.[43]

Tainai next claims that the plain language of section 777A(d)(1), upon which Commerce relies for purposes of its differential pricing analysis, "*expressly* applie{s} to investigations, but is silent on whether it applies to reviews." [44]  According to Tainai, Commerce "should not apply a differential pricing analysis" and "issue remand results recalculating the margin using an {sic} the normal, which is average to average, analysis."[45]  This is not the best interpretation of the statute and Commerce's practice.  Under Tainai's legal interpretation, however, Commerce would similarly be disallowed from applying the standard A-to-A method in an administrative review because section 777A(d)(2) of the Act, which is specific to reviews, is silent on that point, *i.e.*, how to compare U.S. price with normal value.  Indeed, only section 777A(d)(1) of the Act, which Tainai claims "*expressly* applie{s} to investigations," provides for the use of the A-to-A method.  In short, Tainai's rationale is flawed and internally inconsistent.  Additionally, Tainai has made the misplaced assumption that Commerce's use of the differential pricing analysis, to address the statutory criteria provided under section 777A(d)(1)(B)(i) and (ii) of the Act, which the statute provides for use in only a less-than-fair-value investigation, is based upon

---

[42] *See Loper Bright*, 603 U.S. 369, 376
[43] *See JBF RAK*, 790 F.3d at 1363-65 ("Commerce's decision to apply its {A-to-T} comparison methodology in the context of an administrative review is reasonable."); *see also JBF RAK LLC v. United States*, 991 F. Supp. 2d 1343, 1348 (CIT 2014) ("It is logical for Commerce to borrow the comparison methodologies it uses to uncover dumping in investigations and apply those same methodologies in administrative reviews.").
[44] *See* Tainai Case Brief at 6 (emphasis in original).
[45] *Id.* at 7.

"using *Chevron* deference."[46]  Commerce has not relied on *Chevron* in the application of a

differential pricing analysis and the possible use of an alternative comparison methodology in

these final results of review.  Tainai has failed to recognize and understand the fact that

Commerce's use of an alternative comparison method in an administrative review is based on the

modification of its practice pursuant to section 123 of the Uruguay Round Agreements Act

(URAA).[47]

In the *Final Modification for Reviews*, Commerce states that it "will calculate weighted-

average margins of dumping and antidumping duty assessment rates in a manner …. paralleling

the WTO-consistent methodology that {Commerce} applies in original investigations."[48]  In

response to specific adverse rulings by the World Trade Organization (WTO) Appellate Body,[49]

the United States Trade Representative (USTR) notified the House Ways and Means Committee

and the Senate Finance Committee of these findings and consulted with these Congressional

committees concerning implementation of these rulings.  On December 28, 2010, Commerce

published a proposal to modify its practice "in a manner that parallels the WTO-consistent

methodology {Commerce} currently applies in original {less-than-fair-value} investigations."[50]

Subsequently, the USTR submitted a report to the House Ways and Means Committee and the

Senate Finance Committee "describing the  proposed modification, the reasons for the

modification, and a summary of the advice USTR had sought and obtained from relevant private

---

[46] *Id*. at 5.
[47] *See Antidumping Proceedings:  Calculation of Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings:  Final Modification*, 77 FR 8101 (February 14, 2012) (*Final Modification for Reviews*).
[48] *Id.,* 77 FR at 8101.
[49] *Id.* (citing *United States-Laws, Regulations and Methodology for Calculating Dumping Margins (''Zeroing'')*, WT/DS294/R,WT/DS294/AB/R, adopted May 9, 2006; *United States-Measures Related to Zeroing and Sunset Reviews*, WT/DS322/R,WT/DS322/AB/R, adopted January 23, 2007; *United States-Final Anti-Dumping Measures on Stainless Steel from Mexico*, WT/DS344/R, WT/DS344/AB/R, adopted May 20, 2008;  *United States-Continued Existence and Application of Zeroing Methodology*, WT/DS350/R, WR/DS350/AB/R, adopted February 19, 2009.
[50] *Id.*, 77 FR at 8102 (citing *Antidumping Proceedings:  Calculation of the Weighted Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings*, 75 FR 81533 (December 28, 2010)).

sector advisory committees pursuant to section 123(g)(1)(B) of the URAA."[51]  At the same time,

the USTR and Commerce "began consultations with both congressional committees concerning

the proposed contents of this final rule and final modification."[52]

> At the conclusion of the lengthy and in-depth process of input from industry and consultations with Congress, Commerce adopted the proposed changes to its practice in an administrative review to be based on its practice in a less-than-fair-value investigation.In adopting this *Final Modification for Reviews*, the Department's intention is to apply a comparison methodology in reviews that parallels the WTO-consistent methodology the Department currently applies in original investigations, which will necessarily include any exceptional or alternative comparison methods that are determined appropriate to address case-specific circumstances.   Accordingly, similar to the conduct of original investigations, when conducting reviews under the modified methodology, the Department will determine on a case-by-case basis whether it is appropriate to use an alternative comparison methodology by examining the same criteria that the Department examines in original investigations pursuant to section 777A(d)(1)(A) and (B) of the Act.[53]

Given the above factual background behind Commerce's practice in an administrative review, Tainai's argument regarding Commerce's application of a differential pricing analysis in this review is meritless.

Further, as noted above, Commerce's decision on this issue remains lawful and Tainai's remedy for Commerce to use in the final results of redetermination contradicts its logic for not using a differential pricing analysis in the final results of this redetermination.  Thus, for these final results of redetermination, Commerce has continued to use a differential pricing analysis to examine whether the A-to-A method is appropriate, consistent with the statute and the *Final Modification for Reviews*.

---

[51] *Id.*
[52] *Id.*
[53] *Id.* (emphasis added) (citing *Antidumping Proceedings, Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation:  Final Modification*, 71 FR 77722 (December 27, 2006)) (emphasis added).

**Comment 4:   Differential Pricing Analysis is Results Oriented**

*Tainai's Comments*

The following is a verbatim executive summary of argument submitted by Tainai.  For further details, *see* pages 1-5 of Tainai's Supplemental Comments.

> {Commerce}'s Differential Pricing Analysis is Results Oriented and the "finding" that a pattern of prices exists that differ significantly among purchasers, regions, or time periods is driven in large part by the arbitrary selection of test groups. {Commerce}'s analysis artificially divides customers into multiple entities thus creating inaccurate comparisons.  The use of "single" observations in test groups, and ignoring the overall data creates inaccurate comparisons.  The clean and clear analysis provided by Tainai establishes the absence of a pattern of pricing that differs significantly among purchasers, regions, or time period.[54]

**Commerce Position:**  We disagree with Tainai that Commerce's differential pricing analysis is results oriented.  Tainai first argues that Commerce fails to explain why a two percent difference constitutes a significant change.[55]  We disagree and determine the price difference test, with its two-percent threshold, is consistent with the statute.  The CIT has held that the language in section 777A(d)(1)(B)(i) of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[56]  As discussed below, a two-percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings.

In the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales to an affiliated customer in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent

---

[54] *See* Tainai's Supplemental Comments at 1.
[55] *Id.*
[56] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024).

difference from the weighted-average price to unaffiliated customers). In fact, Commerce has found that average prices to an affiliated customer that differ by at least two percent, and, therefore, fail the arm's-length test, "differ significantly" from market prices.[57] The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce margin calculations, *e.g.*, excluded from the calculation of normal value.[58]

Moreover, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[59] If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at less-than-fair-value, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(b) of the Act. Furthermore, in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative than in an administrative review. Indeed, Commerce's regulations at 19 CFR 351.106(c) provide that in an administrative review, Commerce will treat as *de minimis* any weighted-average

---

[57] *See Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value,* 84 FR 6362 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik.")).

[58] *See Affiliated Party Transactions*, 67 FR 69186 (November 15, 2002) (establishing that the overall ratio calculated for an affiliate must be between 98 and 102 percent for sales to be considered in the ordinary course of trade for and used in the NV calculation).

[59] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-de minimis) amount of dumping…").

dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more.

Next, Tainai argues that Commerce has not properly identified its customers in the programming as some customers are known by more than one name.[60]  To support this claim, Tainai states that [            ] and [                  ] are the same customer, [          ] and [                ] are the same customer, and [                ] and [                ] are the same customer.[61]  We disagree with this assertion as Commerce did properly identify purchasers in its price difference test, which are based on Tainai's reported U.S. sales data, whereas identifying customers is the responsibility of Tainai.[62]

As an initial matter, Tainai did not raise customer consolidation in its case brief arguments during the underlying administrative review.[63]  However, in the interest of accuracy, Commerce reviewed the customer code "CUSCODU" codes reported by Tainai and the arguments submitted by Tainai in its comments here and has made certain changes.  In the latest CUSCODU codes reported by Tainai and unchanged by Commerce, [              ] and [              ] are already consolidated into [                ], and [          ] and [                ] are already consolidated into [          ] in the CUSCODU.[64]  Though [            ] and [            ] are reported as different CUSCODU codes by Tainai, we agree with Tainai that [            ] and [

---

[60] *See* Tainai's Supplemental Comments at 2-3.
[61] *Id.*
[62] *See, e.g., Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1298 (Fed. Cir. 2021*)* (citing *QVD Food Co. v. United States,* 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("T}he burden of creating an adeqate record lies with interested parties and not with the {Commerce})"; *see also* Commerce's Letter, "Request for Information," dated October 7, 2022, at C-7.
[63] *See* Case Brief.
[64] *See* Tainai's Letter, "Response to Second Supplemental Questionnaire," dated May 19, 2023, at Exhibit Database.

] are the same purchaser as Commerce never requested additional information nor disputed this during the underlying administrative review.  Therefore, for the final results of redetermination, Commerce will consolidate [                    ] and [                        ] into a single purchaser, as stated in the Preliminary Decision Memorandum,[65] though this does not validate Tainai's argument that the differential pricing analysis is result oriented.  Indeed, this argument does not change Commerce's findings that the percent of the value of U.S. sales that pass the price difference test confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods, and does not impact Commerce's application of the A-to-T method to calculate the weighted-average dumping margin for Tainai.

Finally, Tainai argues that in the price difference test, Commerce should not separate companies with two different names.  Tainai points out that in the Draft Calculation Memorandum, we separated [                ] and [                        ], despite these being one company.[66]  As mentioned above, Commerce agrees that these two companies are the same company and accordingly, we have consolidated [                ] and [                    ] as one purchaser in the price difference test.  Though Tainai states this same error of splitting one purchaser into two exists for other purchasers in the price difference test, Tainai provides no such evidence.

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have discontinued the use of the Cohen's *d* methodology and are using the "price difference test" as a part of our differential

---

[65] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 FR 43290 (July 7, 2023), and accompanying Preliminary Decision Memorandum (PDM) at 17 ("The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes."); *see also* Final Calculation Memorandum.
[66] *See* Tainai's Supplemental Comments at 2.

pricing analysis to determine whether prices differ significantly among purchasers, regions, and periods of time, pursuant to section 777A(d)(1)(B) of the Act and 19 CFR 351.414.  Further, we have discontinued the use of the "mixed method."  Beyond these revisions to the differential pricing analysis included in the Draft Redetermination, for these final results of redetermination, we made one change to the price difference test to consolidate two CUSCODU codes into a single purchaser.  Notwithstanding these changes, the weighted-average dumping margin assigned to Tainai for the POR continues to be 24.78 percent and, thus, there is no change in the final rate from the *Final Results*.[67]  Accordingly we do not intend to issue a *Timken*[68] notice should the Court sustain these final results of redetermination.

1/28/2026

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott,
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance.

---

[67] *See Final Results.*
[68] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).