**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. & C&U AMERICAS, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Ct. No. 24-00025 |
| v. | ) ) ) | |
| UNITED STATES, | ) ) ) | |
| Defendant. | ) ) ) | |

**Order**

Upon consideration of plaintiffs' remand comments and responses regarding redetermination, and upon all other papers and proceedings herein, it is hereby

ORDERED that the remand redetermination is sustained, and it is further

ORDERED that judgment shall enter in favor of the United States.


Dated: _____                     _____
New York, New York                                  Richard K. Eaton, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. and C&U AMERICAS, LLC, | ) ) ) ) | PUBLIC VERSION |
| Plaintiffs, | ) ) | |
| v. | ) ) | Ct. No. 24-00025 |
| UNITED STATES, | ) ) | BPI Information Omitted on Pages 7, 20-21, 30-32 |
| Defendant. | ) ) ) | |

**Defendant's Response to Plaintiff's
Comments on Commerce's Remand Redetermination**

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

/s/ Tate N. Walker
TATE N. WALKER

OF COUNSEL:                                Trial Counsel
K. GARRETT KAYS                            Commercial Litigation Branch
Attorney                                   Civil Division
Office of the Chief Counsel                Department of Justice
for Trade Enforcement & Compliance         P.O. Box 480
U.S. Department of Commerce                Ben Franklin Station
                                           Washington, DC 20044
                                           Telephone: (202) 307-0163
                                           Fax: (202) 305-7643
                                           Email: tate.walker@usdoj.gov

March 30, 2025                             *Attorneys for Defendant*

**Table of Contents**

Background ...........................................................................................................................1

    I.     The Administrative Determination under Review and Remand Order....................1

    II.    Remand Redetermination Proceedings .......................................................4

Argument ...........................................................................................................................10

    I.     Standard of Review..........................................................................................10

    II.    Commerce's Application of Its Differential Pricing Practice Is Supported by Substantial Evidence and Is in Accordance with Law ............................................11

         A.  Relevant Statuary Framework of Commerce's Differential Pricing Analysis Methodologies ------------------------------------------------------------------------------11

         B.  Commerce's Differential Pricing Analysis ........................................................13

         C.  Commerce Lawfully Applied Its Differential Pricing Analysis in Evaluating Tanai's United States Sales Prices ....................................................16

    III.   Tainai's Objections to Commerce's Remand Results Are Not Availing.................17

         A.  Commerce Conducted Its Differential Pricing Analysis Using Comparable Merchandise............................................................................17

         B.  Tainai's Own Analysis of Its Sales May Mask Dumping .................................18

         C.  Commerce's Differential Pricing Analysis Is Consistent with Its Practice Across Numerous Proceedings and Is Not Arbitrary and Capricious...........................23

         D.  Commerce Reasonably Analyzed Tainai's Customers and Control Numbers..30

         E.  Commerce's Selection of Test Groups Is Supported by Substantial Evidence.31

Conclusion ........................................................................................................................32

**Table of Authorities**

**Page(s)**

**Cases**

*AL Tech Specialty Steel Corp. v. United States,*
366 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) ................................................................. 29

*Axiom Res. Mgmt., Inc. v. United States,*
564 F.3d 1374 (Fed. Cir. 2009) ..................................................................................... 21

*Cresswell Trading Co., Inc. v. United States,*
15 F.3d 1054 (Fed. Cir. 1994) .................................................................................. 28, 29

*Dillinger France S.A. v. United States,*
981 F.3d 1318 (Fed. Cir. 2020) .......................................................................... 18, 31, 32

*Dongkuk S&C Co. v. United States,*
600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) .................................................................. 2

*Downhole Pipe & Equip., L.P. v. United States,*
776 F.3d 1369 (Fed. Cir. 2015) ..................................................................................... 18

*DynaEnergetics U.S. Inc. v. United States,*
298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018) ................................................................ 10

*Fujitsu General Ltd. v. United States,*
88 F.3d 1034 (Fed. Cir. 1996) .................................................................................. 22, 23

*Garg Tube Export LLP v. United States,*
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ............................................................. 9, 23

*Globe Metallurgical, Inc. v. United States,*
865 F. Supp. 2d 1269 (Ct. Int'l Trade 2012) ................................................................ 22

*HiSteel Co., Ltd. v. United States,*
653 F. Supp. 3d 1341 (Ct. Intl. Trade 2023) ................................................................ 15

*Huvis Corp. v. United States,*
570 F.3d 1347 (Fed. Cir. 2009) ..................................................................................... 28

*JBF RAK LLC v. United States,*
790 F.3d 1358 (Fed. Cir. 2015) ............................................................................. 2, 9, 23

*JBF RAK LLC v. United States,*
991 F. Supp. 2d 1343 (Ct. Int'l Trade 2014) .................................................................. 4

*Marmen v. United States,* 134 F.4th 1334 (Fed. Cir. 2025) ....................................................... 3, 4

*McKart v. United States*,
    395 U.S. 185 (1969) .......................................................................................... 21, 32

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008) ............................................................................... 29

*Novosteel SA v. United States*,
    284 F.3d 1261 (Fed. Cir. 2002) ............................................................................... 29

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ................................................................................. 21

*Sao Ta Foods Joint Stock Co. v. United States*,
    475 F. Supp. 3d 1283 (Ct. Int'l Trade 2020) ........................................................... 21

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ........................................................................... passim

*Stupp Corp. v. United States*,
    619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ........................................................... 22

*U.S. Steel Group v. United States*,
    873 F. Supp. 673 (Ct. Int'l Trade 1994), *aff'd*, 96 F.3d 1352 (Fed. Cir. 1996).......................... 29

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ......................................................................... 11, 12

*United States*,
    862 F.3d 1337 (Fed. Cir. 2017) ...................................................................... 12, 22, 24, 27

*Xi'an Metals & Minerals Import & Export Co., Ltd. v. United States*,
    50 F.4th 98 (Fed. Cir. 2022) ................................................................................... 18

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
    968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ........................................................... 10

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................... 10

19 U.S.C. § 1673 ..................................................................................................... 11

19 U.S.C. § 1673(2)(B) ........................................................................................... 11

19 U.S.C. § 1673b(b)(3) ...................................................................................... 20, 25

19 U.S.C. § 1673d(a)(4) ........................................................................................... 25

19 U.S.C. § 1675 ..................................................................................................... 28

iii

19 U.S.C §§ 1677a(a)............................................................................................ 11

19 USCS §§ 1515................................................................................................. 28

28 U.S.C. § 2639(a)(1)......................................................................................... 28

**Regulations**

19 C.F.R. § 351.224(g)................................................................................... 26, 27

19 C.F.R. § 351.403(c)......................................................................................... 25

19 C.F.R. § 351.414(b)(1).................................................................................... 12

19 C.F.R. § 351.414(c)(1) ............................................................................ 7, 8, 12

19 C.F.R. § 351.525(b).................................................................................... 26, 27

**Administrative Determinations**

*Alternatives to the Use of Cohen's d; Request for Comment,* 90 Fed. Reg. 21,277 (Dep't of
    Commerce May 19, 2025) ....................................................................... 4, 24

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't of Commerce May 19,
    1997). ............................................................................................................ 27

*Certain New Pneumatic Off-the-Road Tires From India*, 91 Fed. Reg. 9,553 (Dep't of Commerce
    Feb. 26, 2026) ............................................................................................... 25

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of
    Commerce June 6, 2019) ............................................................................... 25

Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720 (May 9, 2014) ....... 15

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic
    of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative
    Review; 2021-2022*, 88 Fed. Reg. 43,290 (Dep't of Commerce July 7, 2023)......................... 14

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic
    of China; Final Results and Review; 2021-2022*, 89 Fed. Reg. 1,548 (Dep't of Commerce Jan.
    10, 2024) .......................................................................................................... 2

*Wood Mouldings and Millwork Products From the People's Republic of China,* 91 Fed. Reg.
    8,823 (Dep't of Commerce Feb. 24, 2026)................................................... 25

*Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351 (Dep't of Commerce
    June 4, 2013)............................................................................................... 13, 1

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| | ) | |
| SHANGHAI TAINAI BEARING CO., | ) | |
| LTD. and C&U AMERICAS, LLC, | ) | PUBLIC VERSION |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Ct. No. 24-00025 |
| | ) | BPI Information Omitted on |
| UNITED STATES, | ) | Pages 7, 20-21, 30-32 |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Defendant's Response to Plaintiffs' Comments on Commerce's Remand Redetermination**

Defendant, the United States, respectfully submits this response to the comments filed by

plaintiffs, Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC (collectively Tainai),

ECF No. 66-67 (Pl. Cmts.), concerning the Department of Commerce's final results of

redetermination filed in accordance with this Court's remand order.  ECF No. 58 (Aug. 28,

2025); *see* Final Results of Redetermination Pursuant to Court Remand (Remand Results), ECF

Nos. 62-63 (Jan. 28, 2026) (P.R.R. 6, C.R.R. 8).[1]  Commerce's remand results comply with the

remand order and are otherwise lawful and supported by substantial evidence.  We respectfully

request that the Court sustain the remand results.

**Background**

**I.    Administrative Determination under Review and Remand Order**

On January 3, 2024, Commerce released its final results of the 35th (2021-2022)

administrative review of its antidumping duty order covering tapered roller bearings and parts

---

[1]  Record citations with P.R./C.R. and Appx refer to citations to the initially filed
administrative record index and joint appendix prepared for the Final Results, *see* ECF Nos. 13,
40-47, and P.R.R./C.R.R. designate citations to the filed remand record index.  *See* ECF No. 42.

thereof, finished and unfinished (TRBs or bearings), from the People's Republic of China

(China).  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the*

*People's Republic of China; Final Results and Review; 2021-2022*, 89 Fed. Reg. 1,548 (Dep't of

Commerce Jan. 10, 2024) (final results) (P.R. 105, Appx003144-003146), and accompanying

Issues and Decision Memorandum (IDM) (P.R. 100, Appx003116-0031134).   Relevant here*,*

Commerce explained that it performed differential pricing analysis on a CONNUM-specific

basis; thus, Commerce determined that Tainai's argument regarding the need to conduct the

analysis on a CONNUM-specific basis was moot.[2]  IDM at 18 (citing Preliminary Calculation

Memorandum at Attachment II (June 29, 2023) (P.R. 90, C.R. 154, Appx086030-086044).

Commerce also rejected Tainai's argument that it is required to determine why the pattern of

prices may differ significantly across purchasers, regions, or time periods.  IDM at 17 (citing

*JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015)).

Second, Commerce explained that there was a pattern of prices for comparable

merchandise that differed significantly among purchasers, regions, or time periods.  IDM at 18.

Commerce noted that "the significance of differences between the average prices of the test

group and the comparison group (*i.e.*, between a specific purchaser, region, or time period and all

other purchasers, regions, or time periods, respectively) is measured by how widely the

individual prices differ within these two groups."  *Id.* at 17.  For this reason, Commerce also

---

[2]  "A 'CONNUM' is a contraction of the term 'product control number,' and is
Commerce's jargon for a unique product defined in terms of a hierarchy of specified physical
characteristics determined in each antidumping proceeding.  All products whose product
hierarchy characteristics are deemed to be identical are part of the same CONNUM and are
regarded as 'identical' merchandise" for the purposes of Commerce's margin calculations.
*Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331, 1334 n.4 (Ct. Int'l Trade 2022).  The
physical characteristics defining a unique CONNUM vary from proceeding to proceeding
depending on the scope of each proceeding as the definition of the subject merchandise changes.
*Id.*

explained that while Tainai identified generally small price variances within its sales, "{w}hen there is little variation in prices within each of these groups . . ., then a small difference in mean prices of the test and comparison group will be found to be significant" in Commerce's differential pricing analysis. *Id.* at 17. Commerce relied on its differential pricing analysis, including the use of Cohen's *d* for one part of that test, and found that a pattern of prices existed that the average-to-average (A-to-A) method could not unmask. IDM at 19. Consequently, Commerce continued to use the average-to-transaction (A-to-T) method to calculate Tainai's weighted-average dumping margin.

Tainai challenged Commerce's use of the Cohen's *d* test as part of the differential pricing analysis. This case was subsequently stayed pending a decision by the Court of Appeals for the Federal Circuit in *Marmen Inc. v. United States.* 134 F.4th 1334 (Fed. Cir. 2025. The Federal Circuit issued its precedential opinion on April 22, 2025. *Id.*

In *Marmen*, the Federal Circuit held that Commerce may not use the Cohen's *d* test as part of its differential pricing analysis when that test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous observations. 134 F.4th at 1348. In doing so, the court held that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here {*i.e.*, data that did not satisfy normal distribution, equally variable, and equally and sufficiently numerous observations}," and it also held that "Commerce {may} {} fashion{} and justify{} a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue." *Id.*

In light of *Marmen*, Commerce agreed that a remand would be appropriate so that

3

Commerce could revise its differential pricing analysis.  *See* Defendant's Response to the Court's February 7, 2025 Order, ECF No. 57 (Aug. 25, 2025).

On August 28, 2025, this Court issued its remand order that remanded the case for Commerce to "reconsider its differential pricing analysis consistent with the Federal Circuit's decision in *Marmen*."  Remand Order at 1.

## II.    Remand Redetermination Proceedings

On December 9, 2025, Commerce released the draft results of redetermination to interested parties and invited comments.  Draft Remand Redetermination Results (Draft Remand Results) (P.R.R. 1).  In its draft remand results, Commerce "reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis."  *Id.* at 1.  Commerce explained that Commerce had chosen to discontinue the Cohen's *d* test in its entirety and replace it with the "price difference test" that determines whether prices differ significantly across purchasers, regions, or time periods.  *Id.* at 3; *see* below at 15.  Commerce also explained that it had "discontinued the use of the 'mixed comparison method' in administrative proceedings."  *Id.*

Commerce explained that it established the price difference test after seeking public comment.  Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i)[3] to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.  *See* Draft Remand Results at 3 (citing *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277, 21,278 (Dep't of Commerce May 19, 2025)

---

[3]  While differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i) refers directly to investigations, Commerce also uses this provision as guidance in reviews.  *See JBF RAK LLC v. United States,* 991 F. Supp. 2d 1343, 1348 (Ct. Int'l Trade 2014) ("It is logical for Commerce to borrow the comparison methodologies it uses to uncover dumping in investigations and apply those same methodologies in administrative reviews").

("Commerce is considering possible alternatives to the current approach for conducting analysis under section 777A(d)(1)(B)(i) of the Act with respect to identifying when prices differ significantly among purchasers, regions, or periods of time.  Accordingly, Commerce solicits public comment and information on potential alternative approaches").

In its initial comments on the draft results of redetermination, Tainai first argued that the calculations in support of Commerce's draft remand decision should have been released.  *See* Tainai's Comments on Draft Remand (Dec. 15, 2025) (P.R.R. 2, C.R.R. 1-2) at 1.  Second, Tainai argued that the draft remand results ignored the statute and that Commerce's "conclusion" was unsupported by its analysis, because price variations among bearings are not based on purchaser, region, or time period but on size, design, and components.  *Id.* at 1, 3-4.  Tainai urged that any analysis be performed on a CONNUM specific basis, including its own analysis based on the quantity of Tainai's sales.  *Id.* at 3-4; Tainai Comments on Remand at Exhibit CRC 1 (C.R.R. 2).  Thus, Tainai urged Commerce to depart from its differential pricing methodology and instead adopt Tainai's analysis that looked to the number of price changes per CONNUM. *Id.*  Tainai also argued that Commerce's differential pricing analysis is not authorized by the statute in administrative reviews and that there is no statutory gap to be filled by Commerce's implementation of differential pricing in administrative reviews.  *Id.* at 4-7.  Tainai argued that "in light of the rejection of *Chevron* by *Loper*, {Commerce} has the ability to reconsider this issue and determine whether {19 U.S.C. § 1677f-1(d)(1)(B)} applies to both investigations and reviews, or only to investigations." *Id.* at 6.

Commerce thereafter, on December 15, 2025, released its preliminary calculation memorandum for the draft remand results.  Preliminary Calculation Memorandum (C.R.R. 3).  In its preliminary calculation memorandum, Commerce set forth its methodology to calculate the

weighted-average dumping margin for Tainai. *Id.* at 2. Commerce removed, compared to its pre-remand analysis, any "references to Cohen's *d* and the mixed methodology." *Id.* Commerce found that some 76.30 percent of the value of United States sales passed the price difference test, demonstrating that weighted-average net price to a given purchasers, regions, or time period is within plus or minus of two percent of the weighted average net price to all other regions, customers, and time period. *Id.* at 2-3. Commerce then determined that the use of the A-to-T method was appropriate because "the weighted average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the average-to-transaction (A-to-T) method." *Id.* at 3.

In additional comments on the draft preliminary calculation memorandum, Tainai argued that Commerce's "differential pricing analysis is results oriented" and the "finding" that a pattern of prices exists that differ significantly among purchasers, regions, or time periods is driven in large part by the arbitrary selection of test groups. Tainai Additional Comments on Draft Remand (December 18, 2025) (P.R.R. 5, C.R.R. 7) at 1 (citation modified). Tainai argued that Commerce's choice of two percent threshold in its meaningful difference test is not a significant change because the "2% rate is greater than the rate of inflation" and Commerce had failed to provide "any explanation as to why a 2% standard had been selected." *Id.* at 1-2. Tainai also argued that Commerce artificially divided customers into multiple entities, creating inaccurate comparisons. *Id.* at 2. According to Tainai, the use of "single" observations in test groups and ignoring the overall data created inaccurate comparisons. *Id.* Tainai argued that its "comparatively simple analysis establishes" the absence of a pattern of pricing that differs significantly among purchasers, regions, or time period. *Id.* at 3.

Tainai further asserted that some "[      ] of sales were made at one price, [      ] were made at a second price, that [      ] of the sales were made at a third price, [      ] of the sales were made at a fourth price, and [      ] of the sales were made at fifth price." *Id.* at 3-4. Tainai argued that "while prices between CONNUM's showed significant differences, the prices within the CONNUM's did not show a significant difference." *Id.* at 4. Ultimately, Tainai concluded that 19 U.S.C. § 1677f-1(d)(1)(B), "assuming it even applies," dictates that when [      ] percent of products sales only saw one or less price change, that Commerce could not conclude that there was a significant variation in price to constitute a pattern. *Id.* at 4-5.

On January 28, 2026, Commerce released its final remand results. Commerce explained, to comply with *Marmen*, that it discontinued the use of the Cohen's *d* test in its administrative proceedings and adopted a new test, after public comment, for evaluating whether price differences among purchasers, regions, or time periods are significant and discontinued the use of the "mixed method" in administrative proceedings. Remand Results at 3-4; *see also* 21-22. Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly. *Id.* at 4.

Commerce explained that in numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 C.F.R. § 351.414(c)(1) and 19 U.S.C. § 1677f-1(d)(1)(B). Remand Results at 4-5. Differential pricing analysis enables Commerce to determine whether to apply an alternative comparison method in this proceeding consistent with the requirements of 19 U.S.C. § 1677f-1(d)(1)(B). *Id.* The differential pricing analysis used here examined whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. *Id.*

The analysis evaluates all United States sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. *Id.* If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin or if the A-to-T method should be used. *Id.* The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. *Id.* Commerce explained that purchasers are based on the reported consolidated customer codes and that regions are defined ZIP codes and are grouped into regions using United States Census Bureau data. *Id.* at 6. Time periods are defined by the quarter within the period of review (POR) based upon the reported date of sale. *Id.* For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the CONNUM and all characteristics of the United States sales, other than purchaser, region, and time period, that Commerce uses in making comparisons. *Id.*

Based on the results of the price difference test and the ratio test, Commerce found that, 76.3 percent of the value of Tainai's United States sales, well exceeding the 33 percent threshold in the ratio test, pass the price difference test. Commerce also confirmed the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. *Id.* at 7. Further, Commerce determined that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold. *Id.* at 8. Thus, Commerce continued to apply the A-to-T method to calculate the weighted-average dumping margin for Tainai.

Commerce addressed Tainai's comments. With respect to Tainai's argument that Commerce "should not consider the purchaser, region, or time period in its analysis" because it

8

fails to account for price variations due to bearing size and type, Commerce explained that

Commerce is not required to determine why there is a pattern of prices that differ significantly

among purchasers, regions, or time periods under 19 U.S.C. § 1677f-1(d)(1)(B)(i) and

abandoning the statutory criteria would be inappropriate  *See* Remand Results at 9-10 (citing *JBF*

*RAK*, 790 F.3d at 1368).  In response to Tainai's argument that Commerce should conduct any

differential pricing analysis by analyzing changes in size, design, and components of the

bearings, Commerce found that its differential pricing analysis already incorporates such product

characteristics as Commerce compares the CONNUM-specific weighted average price of the

sales to each purchaser, region or time period to the weighted-average price of all other United

States sales of that CONNUM.  Remand Results at 10-11.

Additionally, Commerce explained that Tainai's analysis of the quantity of sales that pass

the price difference test is unsupported by the record; Commerce's determination is based on the

proportion of United States sales by value, whereas Tainai's analysis is based on the proportion

of United States sales by quantity.  *Id.*  Furthermore, Commerce disagreed that differential

pricing, and the use of the A-to-T methodology, is not authorized by statute for administrative

reviews.  *Id.* at 14.  Commerce explained that Commerce looks to its practice in investigations as

guidance for its reviews and the statute does not bar such a practice; thus, it did not change the

application of A-to-T comparison methodology in this administrative review.  *Id.* at 14-17 (citing

*JBF RAK,* 790 F.3d at 1368).

Finally, Commerce explained why its "two-percent" threshold is a reasonable measure of

significance, in light of its consistency with other aspects of Commerce's practice in

antidumping proceedings and the statutory flexibility that Commerce enjoys.  *Id.* at 18-20 (citing

*Garg Tube Export LLP v. United States,* 740 F. Supp. 3d 1355, 1366 (Ct. Int'l Trade 2024)).

Commerce explained that these other aspects included the "the arms-length test" pertaining to whether sales to affiliated customers should be considered outside the ordinary course of trade if they fall outside of a range from 98 percent to 102 percent of the average market price. *Id.* at 18. Commerce also explained that its "*de minimis* threshold for an estimate weighted-average dumping margin in an investigation is two percent." *Id.* at 19.

In response to Tainai's argument that Commerce did not properly identify its customers in its differential pricing analyses program files as some customers are known by more than one name, Commerce explained that Tainai did not make this argument in its administrative case brief review. Nonetheless, Commerce reviewed the contested customer codes, made changes, and also found that it had already consolidated many of the customers Tainai argued should be consolidated. *Id.* at 20-21.

Commerce released a final calculation memorandum that supported its conclusion in its remand results and continued to find a pattern of prices that differ significantly among purchasers, regions, or time periods, and did not alter Tainai's final dumping margin from the final results. Final Calculation Memorandum (Jan. 29, 2026) (P.R.R. 7, C.R.R. 9) at 3.

## Argument

### I.    Standard of Review

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). This standard applies to remand redeterminations. *DynaEnergetics U.S. Inc. v. United States*, 298 F. Supp. 3d 1363, 1367-68 (Ct. Int'l Trade 2018). Remand redeterminations are also reviewed for compliance with the Court's order. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

10

II.    **Commerce's Application of Its Differential Pricing Practice Is Supported by Substantial Evidence and Is in Accordance with Law**

The Court remanded this case to allow for Commerce to reconsider its reliance on Cohen's *d*. Upon remand, Commerce identified a new process to replace the Cohen's *d* test – the price difference test – that squarely addresses the Federal Circuit's concern in *Marmen*.

A.    **Relevant Statuary Framework of Commerce's Differential Pricing Analysis Methodologies**

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. The antidumping provisions provide relief for domestic manufacturers by imposing duties upon imports of foreign products that are sold in the United States at less than fair value. 19 U.S.C. § 1673. Therefore, in an investigation, Commerce must evaluate whether imported products are sold in the United States at unfairly low prices. 19 U.S.C. § 1673; *see also Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013). If Commerce concludes that the United States sales are "at less than fair value" – meaning that the product is dumped into the United States market, it will direct United States Customs and Border Protection to assess an "antidumping duty." 19 U.S.C. § 1673(2)(B). A sale is at "less than fair value" when, in general, the price charged in the United States market — the "U.S. price" — is less than the price charged in the home market—the "normal value." *See* 19 U.S.C. § 1677b(a)(l)(B)(i); 19 U.S.C §§ 1677a(a), (b). The antidumping duty is equal to the "amount by which the normal value exceeds the {United States price} for the merchandise." 19 U.S.C. § 1673(2)(B).

In determining whether subject merchandise is being sold at less than fair value, Commerce generally employs two primary methods.[4] The first is the A-to-A method.

---

[4] Commerce may also employ, in rare circumstances, the "{t}ransaction-to-transaction {'T-T'}, in which Commerce compares the normal value of an individual transaction to the export price (or constructed export price) of an individual transaction." *Apex Frozen Foods Priv.*

Commerce compares "the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise" unless it determines another method is appropriate. 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1). Under the A-to-A method, Commerce compares the weighted average of a respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period. *See* 19 C.F.R. § 351.414(b)(1).

However, the A-to-A method may fail to detect instances of "targeted" or "masked" dumping. Masked dumping occurs when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (*Stupp III*) (citing *Apex*, 862 F.3d at 1341). When Commerce uses the A-to-A method, higher-priced United States sales can mask these lower-priced United States sales that are dumped which could leave the domestic industry without a remedy from unfair trade practices. *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (SAA) at 842 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.' In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."). In an investigation, if dumping is masked, then the domestic industry may not receive the relief that the statute affords.

---

*Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (quoting *Union Steel*, 713 F.3d at 1103).

Congress specifically addressed this problem of masking by enacting 19 U.S.C. § 1677f-1(d)(1)(B), which authorizes the A-to-T method. *See Stupp III*, 5 F.4th at 1345 (citing *Apex*, 862 F.3d at 1347). Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the normal values to {U.S. prices} of individual transactions for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the average-to-average method or transaction-to-transaction method}." Congress did not specify the method Commerce should use to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time. The SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 842-43. Thus, Commerce must then justify and employ the appropriate methodology based on the record facts.

**B.      Commerce's Differential Pricing Analysis**

To determine whether there is a pattern of prices that significantly differs across purchasers, regions, or time periods, Commerce devised its "differential pricing analysis," which has evolved since 2013. *See Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351, 33,352 (Dep't of Commerce June 4, 2013) and accompanying IDM at Comment 3; *Xanthan Gum from Austria*, 78 Fed. Reg. 33,354, 33,355 (Dep't of Commerce June 4, 2013).

Commerce currently employs a three-part test to address the statutory requirements under 19 U.S.C. § 1677f-1(d)(1)(B). In the first stage of the current differential pricing analysis, Commerce employs its own "price difference test" to determine whether prices differ significantly. Remand Results at 6. For comparable merchandise, the price difference test

13

examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods. *Id.* This is a mathematical test, not a statistical test like Cohen's *d*. *See id.*; *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43,290 (Dep't of Commerce July 7, 2023) (preliminary results) (Appx003008-003009), and accompanying Preliminary Decision Memorandum (PDM) at Appx003002 ("The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group."). If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test. *Id.*

Second is the "ratio test" assesses the extent of the significant price differences for all United States sales as measured by the price difference test. *Id.* The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. *Id.* If more than 33 percent of the total value of

14

United States sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. *Id.*[5]

Third, if both tests in the first stage (the price difference test and the ratio test) demonstrate the existence of a pattern of United States prices that differ significantly such that the A-to-T method could be considered, then, in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. *Id.* at 7. In considering this question, Commerce employs the "meaningful difference" test, which examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. *Id.* If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the United States market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. *Id.* A difference in the weighted-average dumping margins is considered meaningful, as part of this meaningful difference test, if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting

---

[5] Commerce formerly used a metric, called the "mixed comparison method." If more than 33 percent but less than 66 percent of the respondent's sales passed the now abandoned Cohen's *d* test, then Commerce found that a pattern existed but took a hybrid approach, applying the A-to-T method to those United States sales passing the Cohen's *d* test, and the A-to-A method to the remainder, but only if the meaningful difference test, the last step of the differential pricing analysis, was met. *See HiSteel Co., Ltd. v. United States*, 653 F. Supp. 3d 1341, 1348 (Ct. Intl. Trade 2023) (citing Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26,720 (May 9, 2014); *see also* Remand Results at 3-4 (Commerce also "discontinued the . . . 'mixed method'"). Because 76.3 percent of the value of Tainai's United States sales passed the price difference test and ratio test, the mixed comparison method, if it still existed, would not have altered the remand result. *See* below at 30.

15

weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold. *Id.*; *see also HiSteel,* 653 F. Supp. 3d at 1348.

Thus, even if the sale prices of a particular test group pass the price difference test, it does not mean that Commerce will apply an alternative comparison method because the sales passing price difference test must be sufficiently numerous to also pass the ratio test demonstrating that a pattern exists. Furthermore, Commerce must determine that the standard A-to-A method cannot account for the price differences that are the result of the respondent's pricing behavior in the United States market. The Federal Circuit has sustained the ratio and meaningful difference tests. *Stupp III*, 5 F.4th at 1355-56.

### C.    Commerce Lawfully Applied Its Differential Pricing Analysis in Evaluating Tainai's United States Sales Prices

Commerce lawfully applied the differential pricing analysis in evaluating Tainai's United States sale prices. Commerce found that 76.3 percent of the value of Tainai's United States sales pass the price difference test, confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Remand Results at 7 (citing Draft Calculation Memorandum at 3). Applying the results of the differential pricing analysis overall, Commerce relied on the alternative comparison method based on the A-to-T method to all United States sales to calculate Tainai's weighted-average dumping margin. *Id*. Commerce determined that the A-to-A method does not account for the potential masked dumping because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using an alternative comparison method based on applying the A-to-T method to all United States sales. Draft Calculation Memorandum at 3; *see also* Final Calculation Memorandum at 3. Thus, Commerce lawfully applied the differential pricing analysis in evaluating Tainai's United States sale prices.

16

**III.     Tainai's Objections To Commerce's Remand Results Are Not Availing**

Before this Court, Tainai asserts five main arguments:  (1) Commerce failed to conduct its differential pricing analysis using comparable merchandise, (2) the data submitted by Tainai shows no pattern of significant differences among purchasers, regions or time periods, (3) Commerce's explanation of what constitutes a "significant" difference is arbitrary and capricious, (4) Commerce ignored record evidence regarding the identify of certain customers, improperly split sale to single customers, and (5) Commerce did not provide the basis for establishing such test groups.  *See* Pl. Cmts. at 5-14.  As we demonstrate below, these arguments are unpersuasive and do not provide a basis for setting aside Commerce's remand redetermination.

**A.     Commerce Conducted Its Differential Pricing Analysis Using Comparable Merchandise**

Tainai first argues that Commerce's differential pricing analysis must be on a CONNUM basis, to account for price difference relating to bearing sizes, designs and components.  Pl. Cmts. at 3.  As explained above, Commerce's first step of its differential pricing analysis is to apply the price difference test using *comparable merchandise.*  Remand Results at 3, 5-6; *see also* 19 U.S.C. § 1677f-1(d)(1)(B) (directing Commerce to determine if "there is a pattern of export prices (or constructed export prices) for *comparable merchandise* that differ significantly among purchasers, regions, or periods of time.") (emphasis added).  As Commerce explained, Tainai's argument overlooks key parts of the analysis, as Commerce already compares prices on a CONNUM-specific basis ("comparable merchandise") when conducting its price difference test.  Remand Results at 10-11 ("the price difference test is already based on the CONNUM-specific comparison of prices") (citing Final Calculation Memorandum at Attachment II at 93-

17

103) (demonstrating that Commerce conducts its differential pricing analysis on a CONNUM-specific basis).

When Commerce applies the price difference test, the test is performed using all of the United States sales for each CONNUM, as reported by Tainai in its sales data. Remand Results at 10-11. Commerce compares the CONNUM-specific weighted average price of the sales to each purchaser, region or time period to the weighted-average price of all other United States sales of that CONNUM. *Id.*; *see also Dillinger France S.A. v. United States*, 981 F.3d 1318, 1326 (Fed. Cir. 2020) ("'Comparable merchandise' was defined by product control numbers ('CONNUMs'), which have certain 'physical characteristics' that were subject to notification and comment during Commerce's investigation."); *Xi'an Metals & Minerals Import & Export Co., Ltd. v. United States*, 50 F.4th 98, 107 (Fed. Cir. 2022) (affirming Commerce's determination that "CONNUM-specific data is essential for the accurate calculation of costs due to the variations in physical characteristics of the merchandise.")(citation omitted). Therefore, Tainai's argument that Commerce's analysis should be on a CONNUM-basis to address price differences between differing size, design and components, is unsupported by the record because Commerce took these characteristics into account.

### B.    Tainai's Own Analysis of Its Sales May Mask Dumping

Tainai argues that its United States sales data does not evidence a pattern of prices that differ significantly. Pl. Cmts. at 3-7. However, Tainai's interpretations of its data is inaccurate, and Tainai's argument (that there are minimal price differences in Tainai's sales) is replete with requests that this Court reweigh evidence, which it cannot do. *See Downhole Pipe & Equip., L.P. v. United State*s, 776 F.3d 1369, 1378 (Fed. Cir. 2015).

From the outset, Tainai's proposed data analysis does not square with section 1677f-1(d)(1)(B)(i). *See* Pl. Cmts. at 19-53 (Exs. RC-1-RC-2b). Indeed, Tainai's Ex. RC-1 identifies the changes in gross unit prices, by CONNUM, during the period of review without regard to *customers, regions, or time periods*. Additionally, Exhibits RC-2(a) and RC-2(b) provide information about prices offered to specific customers with their applicable sales date. This analysis provides no information regarding the *regions* of each sale. Other than stating that price changes within each CONNUM are "not extraordinary" and "common in business," Pl. Cmts. at 5, Tainai does not demonstrate whether these prices indicate that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time. *See also* 19 U.S.C. § 1677f-1(d)(1)(B)(i). In contrast, Commerce's analysis on remand is consistent with section 1677f-1(d)(1)(B)(i).

Much of Tainai's analysis focuses on differences in interpretation of record evidence, and Tainai's insistence for Commerce to abandon its differential pricing practice. *See* Pl. Cmts. at 3-7. As Commerce explained, while Commerce makes the determination of whether prices differ significantly on a CONNUM-specific basis, it considers the entire universe of Tainai's United States sale prices when looking for a pattern of prices that differ significantly. Remand Results at 13. In other words, Commerce explained that the number of times that a price changes over the course of a period are not relevant to the analysis. *Id.* The extent of the prices that differ significantly across all CONNUMs sold in United States market during a POR is what establishes whether a pattern existed during the period among different purchasers, regions or time periods. *Id.*

Commerce directly addressed Tainai's arguments about their plain analysis of their sales data demonstrates no threat of dumping. Pl. Cmts. at 7; Remand Results at 10-13. Tainai argues

19

that the sales data represent minimal price differences, namely "that [        ] of the sales were made at one price, [        ] were made at a second price, that [        ] of the sales were made at a third price, [        ] of the sales were made at a fourth price, and [        ] of the sales were made at a fifth price."  Pl. Cmts. at 3-4.  Additionally, Tainai argues that "even though [        ] of sales had NO changes of price during the POR and [        ] changed no more than once, {Commerce} found that 76.3% of the sales 'passed' the price differential test and thus confirmed a pattern of prices that differed significantly."  *Id.* at 4.

However, Tainai's analysis is flawed because Commerce's differential pricing analysis is based on the proportion of United States sales by *value*, and Tainai's analysis, as presented to Commerce, is based on the proportion of United States sales by sales *quantity*.  Remand Results at 11; *see also* at 7 ("Commerce finds that 76.3 percent of the *value* of United States sales pass the price difference test") (emphasis added).  Commerce's determination based on value is in accordance with law and in line with its practice in aligning its practices between reviews and investigations.  *See* 19 U.S.C. § 1677f-1(d)(1)(B) (Commerce shall determine "whether the subject merchandise is being sold in the United States at less than *fair value* by comparing the weighted average of the *normal values* to the export prices.") (emphasis added); *see also* 19 U.S.C. § 1673b(b)(3) ("a weighted average dumping margin is *de minimis* if the administering authority determines that it is less than 2 percent *ad valorem* or the equivalent specific rate for the subject merchandise.")(emphasis added).

Furthermore, Commerce rejected Tainai's flawed interpretation of its own data analysis and instead provided its own corrections to Tainai's interpretation.  Although Tainai states that "[        ] of its sales had NO changes of price during the POR," Commerce found that this count only tracks the first price of each product and does not represent subsequent price changes.

20

Remand Results at 11 (citing Tainai Comments on Remand at 2 and Exhibit CRC-1). Specifically, Commerce explained that the proportion of Tainai's United States sales for products with only a single price amount to [                    ], not [            ], which means that [          ent] by quantity have at least one price change during the POR. *Id.* For the [                        ] which had five price changes during the POR, Tainai reports that this accounts for [          ] of total sales quantity. *Id.* In fact, the proportion of Tainai's United States sales for products with five price changes amount to [

]. *Id.* The actual proportion of bearings with two, three and four different prices over the course of the POR is [          ], [          ] and [          ], respectively. *Id.* at 11-12. Again, this analysis is only relevant if the Court was to abandon the statutory criteria that Commerce adhered to.

Now, *for the first time*, in response to Commerce's explanation that Commerce conducts its differential pricing analysis on a *value*, not *quantity* basis, Remand Results at 11, Tainai argues that their proffered data shows that [          ] of sales by value changed no more than once. Pl. Cmts. at 5-6; *see also* Draft Remand Results at 6-7 (demonstrating that Commerce performed its differential pricing on a value not a quantity basis).

Tainai never provided its expanded analysis at CRC-1 to Commerce to allow the agency to apply its expertise and, if necessary, further develop the record. *McKart v. United States*, 395 U.S. 185, 194 (1969) ("{J}udicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise."); *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998). Nor did Tanai submit this calculation as part of the remand record having only submitted calculations based on quantity instead of value. Tainai's Comments on Draft Remand at Exhibit CRC 1 (C.R.R. 2). The Court

21

should not consider asserted factual materials outside the administrative record because

"reviewing extra-record evidence could convert the court's standard of review into de novo

review." *Sao Ta Foods Joint Stock Co. v. United States*, 475 F. Supp. 3d 1283, 1287 n.5 (Ct.

Int'l Trade 2020) (declining to consider attachments to a brief) (citing *Axiom Res. Mgmt., Inc. v.*

*United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009)).  The Court should decline to entertain

Tainai's arguments supported by its modified Exhibit CRC-1, which Tainai did not provide to

Commerce.

Even if the Court considered Tainai's arguments as to value, Commerce's remand results

still stand, and regardless, as we explained above, the statute is not concerned with the number of

times a particular price may have changed.  Tainai also makes no attempt to reconcile its newest

analysis with section 1677f-1(d)(1)(B)(i) and account for customers, regions, or time periods.

Tainai's disagreement with Commerce's factual findings and explanation on remand does not

demonstrate that Commerce's explanation is unsupported by substantial evidence.  *Globe*

*Metallurgical, Inc. v. United States*, 865 F. Supp. 2d 1269, 1276 (Ct. Int'l Trade 2012) ("{t}he

{substantial} evidence standard of review contemplates that more than one reasonable outcome

is possible on a given administrative record.").

A further flaw in both of Tainai's analyses is that without a test group, "{t}he average-to-

average method, however, sometimes fails to detect 'targeted' or 'masked' dumping, because a

respondent's 'sales of low-priced 'dumped' merchandise would be averaged with (and offset by)

sales of higher-priced 'masking' merchandise, giving the impression that no dumping was taking

place.'" *Stupp III*, 5 F.4th at 1345 (quoting *Apex*, 862 F.3d at 1341).  Indeed, Tainai confuses the

difference between finding that sales are made at significantly different prices, and the complete

process through which Commerce determines whether to apply an alternative comparison

22

method.  "Congress delegated to Commerce the authority to determine where a price difference is significant."  *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1327 (Ct. Int'l Trade 2023) (citing 19 U.S.C. § 1677f1(d)(1)(B)(i)).  Thus, Congress entrusted Commerce to use its expertise and knowledge of pricing to gauge price differences, determinations "involv{ing} complex economic and accounting decisions of a technical nature."  *See Fujitsu General Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).  The Court should not second-guess that judgment here.

Commerce complied with the statute in calculating a weighted-average price between different purchasers, regions or time periods.

**C.      Commerce's Differential Pricing Analysis Is Consistent with Its Practice Across Numerous Proceedings and Is Not Arbitrary and Capricious**

Tainai argues that Commerce should abandon its practice to rely on the price difference and ratio tests, when Tainai's proposed data supposedly does not evidence a significant number of price differences.  Pl. Cmts. at 2-3.  Tainai also disagrees with the consistent application of Commerce's practice of finding whether a two percent difference constitutes a significant price change.  *Id.* at 8-12.

Commerce explained that the first stage of the differential pricing analysis is the "price difference test" which determines whether prices differ significantly.  Remand Results at 6.  For comparable merchandise, the price difference test examines whether the weighted-average net price[6] to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods.  *Id.*  Although Tainai asserts that this

---

[6] Net price refers to United States price "adjusted for billing adjustments, discounts, and rebates, movement and selling expenses."  Remand Results at 12.  Because Taiani used the gross price, Tainai's analysis "is not based on the same data as used in Commerce's price difference test."  *Id.*

two percent test is not contemplated by statute or regulations, this argument is misplaced. The language in section 19 U.S.C. § 1677f-1(d)(1)(B)(i) affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences. *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (Ct. Int'l Trade 2024); *JBF RAK*, 790 F.3d at 1368 (affirming this Court's holding that Commerce's former differential pricing test, the Nails test, "reasonably determines when such a pattern exists."). Additionally, the Federal Circuit has already held that the ratio test is a reasonable method for addressing the pattern requirement of 19 U.S.C. § 1677f-1(d)(1)(B)(i), and that "there is no statutory language telling Commerce how to detect patterns of significantly differing export prices, much less how to aggregate and quantify pricing comparisons across product groups in order to select a statutorily defined comparison method. Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive." *See Stupp III,* 5 F.4th at 1354 (internal citations omitted).

The Federal Circuit has also affirmed Commerce's use of the *de minimis* threshold in the latter part of the differential pricing test – the meaningful difference test. *Apex,* 862 F.3d at 1346. *Apex* held that it reasonable to consider the *de minimis* threshold in Commerce's analysis under this statutory provision (albeit in a different part of Commerce's analysis). *Id.* ("{W}e agree that the difference in the actual antidumping rates that would be assessed—below *de minimis* when calculated with the A-A methodology; above *de minimis* when calculated with an alternative methodology—indeed informs the question of whether the A-A methodology can adequately account for a pattern of significant price differences").

In response to the Federal Circuit's decision in *Marmen*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 19 U.S.C. § 1677f-1(d)(1)(B)(i) to identify whether prices for comparable

24

merchandise differ significantly among purchasers, regions, and time periods. *Alternatives to the Use of Cohen's d; Request for Comment,* 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). Subsequently, in numerous proceedings,[7] Commerce has applied its two percent price difference test, explaining the basis for selection of this threshold. *See* Remand Results at 18-20.

Commerce has applied the price difference test uniformly with good reason. Commerce reasonably explained that other areas of its statute and regulations where "two percent" is considered "significant." Remand Results at 18-19. Specifically, Commerce identified the arms-length test in 19 C.F.R. § 351.403(c), where it finds that sales to an affiliated customer in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers). *Id.* Additionally, the statute uses two percent test in other areas of Commerce's dumping calculations, specifically in 19 U.S.C. § 1673b(b)(3) and 19 U.S.C. § 1673d(a)(4), which establishes the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation. *Id.*

This *de minimis* level is important in Commerce's practice as Commerce has synonymously referred to non *de minimis* levels of dumping as a "significant" amount of dumping. *Id.* at 19 (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019) (final Results of Antidumping Administrate

---

[7] *See Certain New Pneumatic Off-the-Road Tires From India*, 91 Fed. Reg. 9,553 (Dep't of Commerce Feb. 26, 2026) (final results AD admin review; 2023-2024), and accompanying IDM at Comment 1; *see also Wood Mouldings and Millwork Products From the People's Republic of China,* 91 Fed. Reg. 8,823 (Dep't of Commerce Feb. 24, 2026) (final results AD admin. review; 2023-2024), and accompanying IDM at Comment 7.

Review, 2016-2017), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping"). Thus, Commerce inferred that if a weighted-average difference of two percent between United States prices and normal value is significant enough to warrant an affirmative determination of sales at less-than-fair-value, then it is reasonable to conclude that a two-percent price difference is significant within the context of 19 U.S.C. § 1677f-1(d)(1)(b). Thus, given the discretion conferred upon Commerce to implement the statutory directive to detect patterns of significantly differing export prices, *see Stupp III,* 5 F.4th at 1354, Commerce's two percent test for "significant" price differences, drawn from other areas of Commerce's statutory and regulatory schemes that govern its proceeding, is not arbitrary and capricious.

Tainai argues that the SAA requires a case-by-case approach, arguing that a "one size fits all" is not appropriate. Pl. Cmts. at 8. The price difference test does measure relative differences on a case-by-case basis. Commerce considers case-specific averages that are dependent upon the customer, region, and time period, all temporal data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration. *See Certain New Pneumatic Off-the-Road Tires From India* IDM at Comment 1; Remand Results at 5-6. Thus, Commerce's analysis addresses the SAA's concern regarding measuring price differences based on the products and industry at issue.

Although Tainai identifies other Commerce regulations, create certain cut-offs for defining a "significant ministerial error" in a preliminary determination[8] and "substantial

---

[8]  The price difference test does not purport to measure or address ministerial errors, or their effect on the weighted-average dumping margins, but rather its purpose is to evaluate whether prices differ significantly. The 25 percent threshold, however, is used in the meaningful difference test, which examines whether there is a 25 percent relative change between two weighted-average dumping margines calculated using two different comparison methods.

percentage" in countervailing duty calculations – 19 C.F.R. § 351.224(g) and 19 C.F.R. § 351.525(b) – these regulations do not require a finding that Commerce's price difference test is unlawful. Pl. Cmts. at 9. Commerce adopted a reasonable threshold, that the statute utilizes for calculations in other contexts, to implement the statutory directive. *See Stupp III,* 5 F.4th at 1354; *Apex,* 862 F.3d at 1346. Tainai's argument that a two percent substantial difference test is "results oriented" is inaccurate and unsubstantiated. Pl. Cmts. at 9. Commerce explained that a two percent test is truly conservative, as in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent. *Id.* at 19-20 (citing 19 C.F.R. § 351.106(c)). Indeed, Tainai's references to a 25 percent threshold for ministerial errors in dumping margins in a preliminary determination are similarly misplaced, as 19 C.F.R. § 351.224(g) creates a framework to address errors, and their impact on rates, for correcting rates in the preliminary determinations.[9] *See* Pl. Cmts. at 9. Similarly, Tainai's references to 19 C.F.R. § 351.525(b) are also unconvincing, *id.,* as section 351.525(b)(6)(v) refers to "substantial" rather than "significant" and does not apply to antidumping margins. Rather, 19 C.F.R. § 351.525(b)(6)(v) contemplates a test for subsidy attribution of the purchase of utility products in countervailing duty cases. Thus, contrary to Tainai's argument, Commerce's selection of a two-percent test, that the agency uses to analyze price effects in antidumping cases, is a reasonable methodology.

Tainai also complains about the price difference test, arguing that "{i}t has long been Commerce's practice that a 'pattern' within the meaning of the statute exists only when apparent

---

[9] A higher threshold for correcting or amending preliminary determinations is appropriate, given that ministerial errors regardless of their magnitude can be corrected in the final and amended final determinations. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,327 (Dep't of Commerce May 19, 1997).

price differences are beyond something that might occur by chance." Pl. Cmts. at 9. This argument confuses the role of the price difference test (which detects significant price differences) and the ratio test (which detects for a pattern). Commerce has applied the "price difference" test (in lieu of the Cohen's *d* test) to determine whether price differences are significant in numerous proceedings, consistent with the Federal Circuit's opinion in *Marmen*. *See Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009) ("When it changes a past practice, an agency must also show that there are good reasons for its new policy."). Here, there are good reasons for Commerce's new policy, namely the Federal Circuit's opinion in *Marmen*. Commerce has applied the "price difference" test to determine whether price differences are significant in numerous proceedings. It applies the price difference test in conjunctions with the Court-affirmed ratio test, which establishes the existence of a requisite pattern.

Relying upon *Cresswell Trading Co., Inc. v. United States*, 15 F.3d 1054 (Fed. Cir. 1994), Tainai attempts to shift the burden to Commerce to establish that the results of its analysis are not arbitrary. *See* Pl. Cmts. at 10. But the standard of review here requires this Court to hold unlawful any determination under 19 U.S.C. § 1675 "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Moreover, it is the party challenging agency action that bears the burden of demonstrating error. *See* 28 U.S.C. § 2639(a)(1) ("in any civil action commenced in the Court of International Trade under section 515, 516, or 516A of the Tariff Act of 1930 {19 USCS §§ 1515, 1516, or 1516a}, the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct" and "{t}he burden of proving otherwise shall rest upon the party challenging such decision.").

28

*Cresswell* did not hold otherwise.  Rather, the court there found that Commerce had not supported its countervailability finding under an Item (d) investigation – not the antidumping context here – by the "preponderance of the evidence," in light of contradictory evidence of its finding.  15 F.3d at 1061-62.  "The language of *Creswell III* is difficult to apply broadly," *U.S. Steel Group v. United States*, 873 F. Supp. 673, 689–92 (Ct. Int'l Trade 1994), *aff'd*, 96 F.3d 1352 (Fed. Cir. 1996) and the burden shifting at issue in *Creswell Trading* is not applicable in most antidumping issues before the Court.

Finally, Tainai argues that Commerce incorrectly applied the "ratio test" and did not explain its reduction of the threshold for the application of the A-to-T price comparison method to all sales to 33 percent to the pattern. Rem. Br. at 10-12.  It makes sense that Commerce never addressed any changes to the ratio test in any depth, because Tainai never raised any arguments about the ratio test before Commerce.[10]  Tainai Comments on Remand; Tainai Additional Comments on Remand.  "{I}t is black letter law that—to properly preserve an issue for appeal— a party generally must first exhaust its remedies by making its argument before the agency, then brief that argument before the trial court.  Arguments that are not properly preserved are waived." *AL Tech Specialty Steel Corp. v. United States,* 366 F. Supp. 2d 1236, 1245 (Ct. Int'l Trade 2005) (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002)). Tainai failed to exhaust these arguments before Commerce during the remand proceedings and accordingly, the Court should not consider them.   *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1378 (Fed. Cir. 2008)(holding that the appellant failed "to exhaust its administrative remedies on remand").

---

[10]  Commerce explained that it was discontinuing the use of the mixed methodology in the ratio test.  Draft Remand Results at 3; *see* above at 15.

In any event, Tainai's argument has no effect on the application of the A-to-T comparison method in this case. Either way, as Commerce explained, if more than 33 percent of the total value of United States sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. Remand Results at 6. Tainai references the Federal Circuit's holding in *Stupp III,* which explained that if the total percentage is 66 percent or more, Commerce tentatively selects the alternative A-to-T method as the comparison method for all transactions it will use to calculate the weighted average dumping margin. *Stupp III*, 5 F.4th at 1347. Commerce found that *76.3 percent* of the value of United States sales passes the price difference test. Final Calculation Memo at 3. Thus, under either the mixed comparison analysis at issue in *Stupp III* (66 percent), or Commerce's practice here post-*Marmen* (33 percent), A-to-T would be appropriate. 76.3 percent of the sales value pass the price difference test passes under either threshold, and Commerce determined that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the average-to-transaction (A-to-T) method.

**D.    Commerce Reasonably Analyzed Tainai's Customers and Control Numbers**

Tainai further seeks to relitigate certain fixes to its customer list that Commerce has already addressed. Specifically, Tainai raises issues regarding the consolidation of sales to

], [                                          ], and [

]. Pl. Cmts. at 12. Commerce explained that sales to these companies [                                          ] are already consolidated into [

], and agreed that [          ] and [                    ] are the same purchaser. Remand Results at 20-21. Additionally, Tainai claims that it identified [

] as interchangeable during the proceeding.  Pl. Cmts. at

12.  Although Tainai contends that Commerce rejected this claim, Commerce in fact found that

[                    ] and [                              ] are already consolidated into [

    ] in the CUSCODU.  Remand Results at 20.  Therefore, Commerce addressed and

agreed with Tainai's arguments in its remand results.  *See* Remand Results at 20-21.  There is no

longer a live dispute about the consolidation of these customers.

E.    **Commerce's Selection of Test Groups Is Supported by Substantial Evidence**

Finally, Tainai argues that Commerce has not explained the basis for selecting the test

groups, such that the selected test groups create absurdities such as the same CONNUM being

split into two groups.  Pl. Cmts. at 13.  Specifically, Tainai references control number

[                              ] which was split with a test group of [  ] and a base group of [   ] and

a second group with a test group of [   ] and a base group of [  ].  *Id.*  Tainai misunderstands

Commerce's analysis.  Specifically, for each purchaser, region, and time period, Commerce

segregates the respondent's United States sales for comparable merchandise into two groups: the

"test group" includes all sale prices of comparable merchandise to a given purchaser, region, or

time period, and the "comparison group" includes all other sale prices of comparable

merchandise.  *Stupp III*, 5 F.4th at 1346; *see also Dillinger France*, 981 F.3d at 1324.  In other

words, Commerce measures the "significance" of differences between the weighted average

prices of the test group and the comparison group (*i.e.*, between a specific purchaser, region or

time period and all other purchasers, regions, or time periods, respectively) by how widely the

individual prices differ within these two groups.

For the control number [                              ], Commerce followed this approach.

Commerce subtracted the transaction to a specific customer (B), from the total number of

transactions to all customers of control number [                                    ] (A), to create the base or comparison group (C = A-B).  *See* Final Calculation Memorandum at 248.  This is the same analysis for each CONNUM.  *Id.* at 243-45, 248.  Although control number

] compared [                    ] to [                    ] for customers who had only [

] for this CONNUM during the relevant period, and vice versa, it is clear from Commerce's calculations memorandum that those transactions identified the universe of sales of

[                                    ], even though the number of transactions was different for the [    ] customers of those products.  The same methodology was applied for every customer and is discernible from Commerce's calculation memorandum.  *Id*.  For example, for

], the universe of sales included [                    ], and the test group (*i.e.,* [

]) was compared relative to the other sales of [                                ]).  *Id.* at 243.  Thus, Tainai's attempt to single out a single scenario where a test group of [  ] for a particular customer and a base group of [   ] representing sales to all other customers and a second group with a test group of [   ] and a base group of [  ] is simply unavailing.  Commerce explained how it followed its normal practice of selecting the test groups and those in the comparison groups, thereby providing a "rational explanation for the selection of these test groups."  Pl. Br. at 13.

## Conclusion

For these reasons, we respectfully request that this Court sustain Commerce's remand redetermination and enter final judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

32

<table>
<tr><td></td><td>TARA K. HOGAN<br>Assistant Director</td></tr>
</table>

|  |  |
|---|---|
|  | /s/ Tate N. Walker |
| OF COUNSEL: | TATE N. WALKER |
| K. GARRETT KAYS | Trial Counsel |
| Attorney | Commercial Litigation Branch |
| Office of the Chief Counsel | Civil Division |
| for Trade Enforcement & Compliance | Department of Justice |
| U.S. Department of Commerce | P.O. Box 480 |
|  | Ben Franklin Station |
|  | Washington, DC 20044 |
|  | Telephone: (202) 307-0163 |
|  | Fax: (202) 305-7643 |
|  | Email: tate.walker@usdoj.gov |

March 30, 2026                                    *Attorneys for Defendant*

## Certificate of Compliance

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 9,829 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

s/ Tate N. Walker
Tate N. Walker